UNITED STATES of America,
Appellee,

v.

Donald FERRARINI, Everett J. Vieira, A. Michael Kagan, Bruno Rumnigant, Howard Miller,* Defendants-Appellants.

Docket Nos. 99–1236, 99–1239, 99–1250 and 99–1291.

United States Court of Appeals, Second Circuit.

Argued March 8, 2000

Decided July 18, 2000

---

* We note that our official caption incorrectly spells defendant Rumignani's name as "Rumnigant" and lists defendant Miller, who is no longer a party to this appeal, as an appellant.

Christopher W. Chan, New York, NY, for Defendant–Appellant Ferrarini.

Arthur J. Viviani, New York, N.Y. (Don D. Buchwald, James M. Keneally, New York, NY, on the brief), for Defendant–Appellant Vieira.

Nathan Z. Dershowitz, New York, N.Y. (Glenn A. Garber, David B. Krauss, Alan M. Dershowitz, New York, NY, on the brief), for Defendant–Appellant Kagan.

Larry H. Krantz, New York, N.Y. (Mary Lou Chatterton, New York, NY, on the brief), for Defendant–Appellant Rumignani.

William F. Johnson, Special Assistant United States Attorney, New York, N.Y. (Mary Jo White, United States Attorney for the Southern District of New York, Robert S. Khuzami, Robert E. Rice, Assistant United States Attorneys, New York, NY, on the brief), for Appellee United States of America.

Before: CARDAMONE, CALABRESI, and PARKER, Circuit Judges.

CALABRESI, Circuit Judge:

Defendants Donald Ferrarini, Everett J. Vieira, A. Michael Kagan, and Bruno Rumignani appeal from their judgments of conviction after a jury trial in the United States District Court for the Southern District of New York (Denise Cote, *Judge*). Ferrarini, Vieira, Kagan, and Rumignani were all charged in a 82–count indictment alleging, *inter alia,* conspiracy to commit securities fraud, to make false statements to the Securities and Exchange Commission ("SEC"), to commit mail fraud, and to commit insurance fraud. All four defendants were convicted of conspiracy, in violation of 18 U.S.C. § 371, as well as of various substantive offenses. Thus, defendants Ferrarini and Rumignani were convicted of securities fraud, in violation of 15 U.S.C. § 78ff and 78j(b), of false statements to the SEC, in violation of 18 U.S.C.

§ 1001, of mail fraud, in violation of 18 U.S.C. § 1341, and of insurance fraud, in violation of 18 U.S.C. § 1033(b)(1);[1] defendant Kagan was convicted of mail fraud, in violation of 18 U.S.C. §§ 1341 and 2; and defendant Vieira was convicted of making false statements to the United States Attorney's Office and the FBI, in violation of 18 U.S.C. §§ 1001 and 2.

On appeal, defendants raise numerous challenges to their convictions and sentences, most of which we reject in an unpublished summary order, filed today. Three of their arguments, however, merit greater discussion. We write this opinion to address (1) defendant Kagan's contention that his heart condition precluded him from taking the stand at trial and that the district court's denial of his motion to sever or to adjourn the trial on medical grounds therefore deprived him of his constitutional right to testify, (2) the assertions of defendants Vieira and Kagan that the district court erred in instructing the jury on conscious avoidance, and (3) the arguments of all four defendants that a premium finance company does not fall under the definition of a "financial institution" in the Sentencing Guidelines. We affirm.

## I. BACKGROUND

This case revolves around the frauds committed by Underwriters Financial Group ("UFG") from the early 1990s through mid–1995, when UFG filed for bankruptcy. During this time, Ferrarini was the President and Chief Executive Officer of UFG, as well as a shareholder. Rumignani, also a shareholder, was the Executive Vice President and Chief Operating Officer. Vieira, who did not own any shares in UFG, was employed as a business analyst for the firm. Kagan had no direct relationship to UFG; he was, however, on the Board of Directors of CPF Premium Financing ("CPF"), one of the companies defrauded by UFG.

Key to this story are also two accomplice witnesses. Mark Bailine was the Vice President of Finance and Administration of UFG who oversaw the accounting department. He was one of the central prosecution witnesses at trial, testifying pursuant to a cooperation agreement. Howard Miller, a Senior Vice President at UFG, oversaw sales and marketing and also testified for the government.[2]

Around 1970, Ferrarini, Rumignani, Miller, and one Burt Matfus began working together in a privately owned commercial insurance brokerage firm. The firm changed names several times, but finally became UFG in the early 1990s.[3] As an insurance broker, UFG assisted its clients in obtaining insurance, collected from clients the annual insurance premiums that UFG then paid to the insurance carriers, and remitted any refunds or credits from the insurance carriers to the insureds (this could happen, for instance, if the amount of coverage was reduced and, hence, the price of the premium decreased, after it had already been paid). UFG also assisted its clients in obtaining loans from premium finance companies ("premium finance loans"). *See infra* Section I.B.1.

Starting in the mid–1980s, UFG encountered serious financial difficulties. In order to alleviate an expenses-greater-than-

---

1. Defendant Rumignani was also convicted of making false statements to the SEC, committing mail fraud, and engaging in insurance fraud, in violation of 18 U.S.C. § 2 (aiding and abetting liability).

2. Miller was initially charged along with Ferrarini, Vieira, Rumignani, and Kagan, but eventually pleaded guilty, pursuant to a cooperation agreement, to conspiracy, securities fraud, false statements to the SEC, mail fraud, and false statements to the United States At-

torney's Office and FBI. He then testified at the trial for the government. He filed a timely notice of appeal, but died shortly thereafter. This court subsequently vacated his conviction and remanded the case to the district court with instructions to dismiss the charges against him.

3. For simplicity, we refer to UFG and its predecessor companies as "UFG."

income problem, it merged with a publicly traded company to form another public company named Underwriters in the hope that stock offerings by the new company would produce an infusion of capital. Because Underwriters was a public company, it was obliged to file quarterly and annual reports with the SEC. In these reports, Underwriters was required to make various financial disclosures including information on the business operations of its wholly owned subsidiary, UFG.

After the merger, UFG continued in the commercial insurance brokerage business. The merger, however, did not have the desired ameliorative financial effects. The company with which UFG joined was saddled with approximately $8 million in prior debt, and this debt was assumed, under the merger agreement, by UFG. Against this backdrop of UFG's less than rosy financial picture, the frauds unfolded.

### A. Embezzled Premiums and Credits

The evidence at trial, viewed in the light most favorable to the government, see *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir.1999), revealed that over the course of eight years, from 1987 to 1995, Ferrarini, assisted by Rumignani, Matfus, and Bailine, embezzled more than $10 million from UFG's clients and from insurance carriers. As noted above, UFG, as an insurance brokerage firm, stood between its clients, the insureds, and insurance carriers. Accordingly, UFG's clients would forward their premium payments to UFG, which, after deducting its commission, would, in the ordinary course of events, pay the insurer. Similarly, insurance carriers generally transmitted through UFG any credits owed to the insureds. Rather than forwarding these sums to the insurance carrier or the insured to whom they were owed, however, UFG's accounting department, under Ferrarini's instruction, removed selected premiums and credits from its "accounts payable," issued itself a check in the same amount, and recorded these moneys as income. Ferrarini and Rumignani both signed such checks depositing the embezzled funds in UFG's account.

### B. Fraudulent Premium Finance Loans

#### 1. UFG loans from CPF, Imperial, and AI Credit

Commercial insurance premiums are often sizeable, for instance, as much as $1 million, and are due in a lump sum on the effective date of coverage. To aid insureds who lack that kind of capital, organizations called premium finance companies offer loans to insureds, who use the money lent to them to make full payment of the annual premium to the insurance carrier on the due date. These insureds then repay the premium finance company with an upfront down payment followed by monthly installments, typically over nine months. These loans are called premium finance loans and are at the heart of the frauds in this case.

If an insured defaults on the premium finance loan, the premium finance company has the right to retain the down payment, to cancel the insurance policy being financed, and to obtain from the insurance carrier, which had previously been paid in full for the entire policy year, any unearned premium, i.e., the premium pro rated for the balance of the year. Premium finance loans typically have low interest rates because they are fully secured with collateral (the down payment and the unearned premium).

Premium finance loans can be made in two ways: "care of" or "direct bill." "Care of" loans are submitted on behalf of the borrower (the insured who seeks to finance an insurance premium) by the insurance broker (e.g., UFG). Once the premium finance loan is approved, the premium finance company sends the loan proceeds, as well as all documentation relating to the loan, such as payment coupons, to the insurance broker. In a "direct bill" loan, the loan proceeds are still sent to the insur-

ance broker, but the loan documentation is sent directly to the borrower.

From mid–1993 to mid–1995, when it filed for bankruptcy, UFG made 37 fraudulent premium finance loan applications, totaling $12 million, to three premium finance companies, Imperial Premium Finance, Inc. ("Imperial"), AI Credit Corporation, and CPF. In order to boost UFG's income, Ferrarini, Rumignani, Vieira, and others at UFG submitted fraudulent "care of" loan applications to these premium finance companies, purportedly on behalf of UFG clients. The clients, however, had in fact already paid their premiums in full and, having done so, did not of course authorize the loans. UFG used the proceeds from these loans to pay UFG's operating expenses, including installment payments on the fraudulent premium finance loans.

Most of the fraudulent loan applications were submitted to CPF. This was because UFG had an insider at CPF, Kagan, who pressured CPF into approving the loans. From August 1994 through November 1994 alone, Ferrarini, Rumiginani, and others at UFG submitted 21 fraudulent "care of" loans, worth $5,946,358, to CPF. Kagan saw to it that the loans were approved by CPF, and in exchange for his services, received $375,000 from UFG. In time, an executive at CPF became suspicious about the high number of "care of" loans from UFG. As a result, CPF rejected an application for a "care of" loan from UFG, and the co-conspirators applied to CPF for several "direct bill" loans instead.

Subsequently, in February 1995, Ferrarini, Rumignani, Kagan, Vieira, and others held meetings at Vieira's apartment to discuss UFG's financial woes, and especially how the firm would meet its monthly payments on the fraudulent premium finance loans. And in March 1995, Kagan succeeded in pushing through another "care of" loan for over $1 million. (UFG paid him $50,000 in April 1995 for his help.) Finally, in May 1995, UFG was no longer able to pay the monthly installments on its numerous fraudulent premium finance loans. Vieira then admitted the scheme to a CPF officer. Several days later, Matfus committed suicide. In the summer of 1995, UFG filed for bankruptcy. By that time, UFG owed CPF approximately $4.9 million in principal and interest and, as a result of UFG's inability to repay this amount, CPF was, in due course, forced to liquidate.

### 2. KBC loans from CPF

From January 1994 through August 1994, before Kagan began participating in UFG's fraud on CPF, he perpetuated his own fraud on CPF. In addition to serving on the Board of CPF, Kagan also owned his own insurance agency, KBC Systems, Inc. ("KBC"). KBC made five fraudulent applications to CPF for phony premium finance loans, worth $284,349, on a "care of" basis. None of the loans was actually used to finance the insurance premium of the stated borrowers, as was claimed on the applications. Instead, they were used to pay KBC's operating expenses. KBC eventually repaid these loans in full before CPF learned of the fraud.

### C. Securities Fraud and False statements to the SEC

Because Underwriters was a public company, it was required to submit various filings to the SEC. Ferrarini and Rumignani, who were both directors of Underwriters, misrepresented UFG's financial condition (1) by falsely including in these documents, as "income" to UFG, the embezzled premiums and credits as well as the proceeds from the false premium finance loans and (2) by omitting from the filings UFG's liabilities to repay the embezzled premiums and credits as well as the fraudulent loans. In these ways, Underwriters overstated its income and understated its liabilities by an aggregate amount of more than $11 million.

### D. False Statements to the FBI

In October 1995, Special Agent Michael J. Degnan of the FBI and an Assistant United States Attorney interviewed Vieira. In the course of the interview, Vieira falsely stated that "he did not know that the contracts submitted to CPF were for anything other than premium finance loans until late April or early May 1995." Jt. App. at 1165.

## II. DISCUSSION

### A. Right to Testify

In July 1998, Kagan suffered a heart attack. Shortly after, he moved to adjourn or to sever his trial for medical reasons. The district court granted the motion to adjourn and re-scheduled the trial from September 1998 to January 1999. Kagan subsequently renewed his motion for a severance or adjournment, again on medical grounds. After holding two hearings and reviewing the medical evidence submitted by Kagan and the government, the district court denied the motion. Relying on the medical evidence in the record and the court's own observations of the defendant, it concluded that a trial would not "produce any threat to [Kagan's] physical health." Kagan App. at 352.

Arguing that the gravity of his heart condition precluded him from taking the stand, Kagan contends that the district court forced him involuntarily to waive his constitutional right to testify when it denied his motion to sever or to adjourn his trial on medical grounds. The district court, he asserts, rejected the motion without specifically considering the effect of his heart condition on his ability to testify at trial and instead considered only his physical capacity to proceed to trial generally.

■ Normally, we review the decision of the district court to grant or to deny a continuation or severance on the basis of a defendant's physical condition for abuse of discretion. *See Bernstein v. Travia,* 495 F.2d 1180, 1182 (2d Cir.1974); *United States v. Bernstein,* 417 F.2d 641, 643 (2d Cir.1969); *United States v. Knohl,* 379 F.2d 427, 437 (2d Cir.1967). But Kagan's argument forces us instead to determine whether the district court bears an affirmative obligation to examine the impact of a medical condition on the defendant's constitutional right to testify and whether, in this case, Kagan's physical condition forced him involuntarily to waive that right.

■ There can be no doubt that a criminal defendant has a constitutional right to testify in his own defense. *See Rock v. Arkansas,* 483 U.S. 44, 51, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). And this right, the Supreme Court has stated, is "[e]ven more fundamental ... than the right of self-representation." *Id.* at 52, 107 S.Ct. 2704. Accordingly, it is incumbent upon trial courts to prevent an involuntary waiver of the right. *See Ortega v. O'Leary,* 843 F.2d 258, 263 (7th Cir.1988) ("When waiver of such an important right [as the right to testify] is at issue, a trial court should carefully ascertain through a methodical inquiry whether this right has been voluntarily and intelligently forfeited.").

■ The case before us, therefore, requires us to consider what steps a district court must take to protect this right when ruling on a motion to sever or to adjourn a trial on medical grounds. We conclude that a trial court does not have an obligation, *in every case* in which a defendant moves for a medical severance or adjournment, to assess the impact of a defendant's medical condition on her right to testify. *See Brown v. Artuz,* 124 F.3d 73, 79 (2d Cir.1997) (holding that there is "no general obligation on the trial court to inform a defendant of the right to testify and ascertain whether the defendant wishes to waive that right" and concluding instead that it is trial counsel, and not the trial court, that bears the duty of apprising the defendant about the risks and benefits of testifying). At the same time, in cases in which a trial court has sufficient cause to question a defendant's physical capacity to take the stand or when the defendant has

specifically raised the issue of capacity to testify, the district court, in order to insulate this fundamental constitutional right from an involuntary waiver, must determine whether the defendant is in fact physically able to testify. *Cf. United States v. Purnett*, 910 F.2d 51, 56 (2d Cir.1990) (holding that, "where a trial court has sufficient cause to doubt the competency of a defendant to make a knowing and intelligent waiver of the right to counsel," it must take affirmative measures to ensure that the competency issues are properly resolved in order for any waiver of the right to counsel to be valid, despite the fact that there is no general requirement that a trial court find a defendant competent whenever a defendant has invoked the right to self-representation.).

■■ Moreover, in those cases in which a district court *is* required to make a finding as to the defendant's capacity to testify, it cannot satisfy that obligation simply by stating the generic conclusion that the defendant is physically able to proceed to trial. This is so for two reasons. First, the fact that a defendant has the physical capacity to be present at trial and to assist his defense counsel does not necessarily mean that he is also capable of testifying. And second, the rights to testify, to be present, and to assist in the preparation of one's defense have separate and distinct sources, scopes and purposes. Thus, the right to testify stems from the due process requirement that a criminal defendant be given "an opportunity to be heard in his defense." *Rock*, 483 U.S. at 51, 107 S.Ct. 2704 (quoting *In re Oliver*, 333 U.S. 257, 273, 68 S.Ct. 499, 92 L.Ed. 682 (1948) (alteration omitted)). It is also "[l]ogically included" in the right of an accused, under the Sixth Amendment's Compulsory Process Clause, to call favorable witnesses. *Id.* at 52, 107 S.Ct. 2704. And it serves as a "necessary corollary to the Fifth Amendment's guarantee against compelled testimony." *Id.* The constitutional right to be present at trial, however,

is more circumscribed and obtains only "to the extent that a fair and just hearing would be thwarted by [the defendant's] absence." *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 108, 54 S.Ct. 330, 78 L.Ed. 674 (1934)) (internal quotation marks omitted). "Although ... th[e] privilege of presence is not guaranteed 'when presence would be useless, or the benefit but a shadow,'" *id.* (quoting *Snyder*, 291 U.S. at 106–07, 54 S.Ct. 330), there is no similar limitation on the right to testify, that is, a criminal defendant enjoys the constitutional right to testify even when to do so would not be useful.

■■ In this case, Kagan initially put into play the issue of his capacity to testify. At a pre-trial conference on the motion for a medical severance or adjournment, Kagan's trial counsel explicitly expressed his concern that "this is a case where I think it's ... quite likely in the normal course of events Mr. Kagan would testify.... [But][t]here is no way I can envision his being in a position to be able to testify in his own behalf given his current medical condition." Kagan App. at 96. Trial counsel again raised this issue in a written submission. We agree with Kagan therefore that the district court was required to assess his physical ability to be a witness in his own defense. But because Kagan was in fact physically capable of taking the stand at trial, it is clear on the record before us that no involuntary waiver of Kagan's right to testify ultimately occurred.

■ Before it denied the motion for the medical severance or adjournment, the court below asked Kagan a series of questions to ascertain whether he was mentally competent to be tried. In answer to these, Kagan specifically conceded that he suffered from no mental condition that would interfere with his decision to testify at trial or with his ability actually to testify.[4]

---

4. The court also directed a similar inquiry at

Kagan's attorney, who had articulated the

Moreover, in a post-trial order denying Kagan's motion for bail pending appeal, the district court found that "[n]o evidence submitted by Kagan regarding his health undermined the Court's judgment that he was able, if he wished to do so, to testify on his own behalf. Indeed, the Court watched Kagan attentively during the trial and saw no evidence of any health problem that would have raised any issue as to his ability to assist counsel in his defense or to testify." Kagan App. at 426.

The district court's factual finding was amply supported by the evidence in the record, and in particular, by the district court's analysis of the expert testimony presented in connection with the motion for severance or adjournment. The government's expert, Dr. Weld, had concluded that Kagan had suffered from "a very serious cardiovascular condition" that had since been "successful[ly] treat[ed]" and that "this condition is not a contraindication to participation in trial proceedings." *Id.* at 128. More specifically, Dr. Weld stated that, based on the results of tests administered, "Kagan should not have cardiac symptoms during trial proceedings" because "there is no objective evidence to suggest that his arrhythmia is stress-inducible."[5] *Id.* at 107. Defendant's expert, Dr. Lux, on the other hand, concluded that Kagan "needs to be aggressively treated, preferably in a Heart Failure Center ... and cannot be exposed to the physical and emotional trauma of trial until he stabi-

lizes." *Id.* at 253. Carefully comparing the two reports, the district court found that both agreed on the basic facts of Kagan's medical condition—such as his "ejection fraction," an index which is a "critical measure" of congestive heart failure—but differed only as to their ultimate conclusions. *Id.* at 348.

The court below decided to reject Dr. Lux's conclusion, and articulated several reasons for doing so, including (1) that Dr. Lux acknowledged the absence in Kagan of several symptoms typically indicative of congestive heart failure and (2) that Kagan's own treating physicians—of which Dr. Lux was not one—did not recommend the kind of aggressive treatment urged by Dr. Lux. It was well within the court's discretion to choose between the competing conclusions of Dr. Lux and Dr. Weld. *Cf. Bernstein v. Travia,* 495 F.2d at 1182 (finding that the district court did not abuse its discretion in declining to hold a hearing on a motion for a medical continuance or severance where there was "no dispute over the basic medical facts; only the conclusion to be drawn therefrom"). Once the district court chose to accept Dr. Weld's view of Kagan's capacity, the evidentiary basis for its later finding that Kagan was physically able to take the stand was adequately established.

Since the record supports the conclusion that Kagan's heart condition did not prevent him from testifying at trial, the dis-

---

concern that Kagan's heart condition had adversely affected his memory. The court asked counsel, "[g]iven the current state of his memory, do you have any concern about his ability to effectively defend himself at trial, including, if he decides to do so, effectively present his case by taking the stand?" Kagan App. at 337. Counsel responded in the negative.

5. Kagan contends that Dr. Weld's testimony actually supports the position that he was not physically capable of testifying because Dr. Weld stated in his report that "[f]rom a subjective standpoint, Mr. Kagan is a highly emotional man who (by his own description) perceives interaction with potential antagonists as extremely stressful.... I consider usual

courtroom proceedings to be likely to produce an emotional crisis or collapse." Kagan App. at 107–08. The district court rejected this portion of the report as a lay opinion, however, because Dr. Weld's area of expertise was cardiology, not psychiatry. We need not decide whether the district court erred in classifying this testimony as "lay" because Kagan's argument is that he was not *physically* capable of testifying, not that he was *emotionally* unequipped to do so. Indeed, it is Kagan's adherence to a rigid distinction between physical and mental health that leads him to dismiss the significance of his own concession, in response to the district court's inquiry, that he was mentally competent to testify.

trict court's denial of his motion for a medical severance or adjournment did not deprive him of his constitutional right to testify.[6]

### B. Conscious Avoidance Instruction

Over the objections of Vieira and Kagan, the district court instructed the members of the jury that, as to the substantive counts of the indictment, they could find a defendant to have known a particular fact if the evidence showed "beyond a reasonable doubt that the defendant ... was aware that there was a high probability of a fact, but deliberately and consciously avoided confirming this fact." Jt.App. at 1415–15. The court also instructed the jury, again, over the objections of Vieira and Kagan, that, as to the conspiracy count, it could find a defendant to have known of the unlawful object of the conspiracy—a requisite finding to sustain a conspiracy conviction—if it found the defendant to have "deliberately closed his eyes to what otherwise would have been obvious." Jt.App. at 1416. On appeal, both Vieira and Kagan contend, for slightly different reasons, that the conscious avoidance instructions were erroneous and therefore warrant reversal. We agree that the district court erred in giving the instructions, but conclude that the errors were harmless.

A conscious avoidance instruction permits a jury to find that a defendant had culpable knowledge of a fact when the evidence shows that the defendant intentionally avoided confirming the fact. *See United States v. Adeniji*, 31 F.3d 58, 62 (2d Cir.1994). That is to say, the instruction permits a finding of knowledge even where there is no evidence that the defendant possessed actual knowledge. But it may only be given if (1) the defendant asserts the lack of some specific aspect of

knowledge required for conviction, *see United States v. Civelli*, 883 F.2d 191, 194 (2d Cir.1989) and (2) the appropriate factual predicate for the charge exists, i.e., "the evidence is such that a rational juror may reach [the] conclusion beyond a reasonable doubt .... that [the defendant] was aware of a high probability [of the fact in dispute] and consciously avoided confirming that fact," *United States v. Rodriguez*, 983 F.2d 455, 458 (2d Cir.1993). Unless these two requirements are satisfied, the instruction should not be given. But an erroneously given conscious avoidance instruction constitutes harmless error if the jury was charged on actual knowledge and there was "overwhelming evidence" to support a finding that the defendant instead possessed *actual* knowledge of the fact at issue. *Adeniji*, 31 F.3d at 64.

### 1. Vieira

Vieira was charged with one count of making false statements, two counts of mail fraud (in connection with a fraudulent loan application to Imperial), and two counts of conspiracy to commit, *inter alia*, mail fraud (in connection with a scheme to obtain fraudulent premium finance loans). The jury ultimately acquitted him of the two substantive mail fraud counts. On appeal, he contends that the conscious avoidance charge was erroneous (1) because it inappropriately allowed the jury, based on mere conscious avoidance, to infer the requisite intent to participate in the conspiracy and (2) because the necessary factual predicate for the charge did not exist.

### a. intent to participate in the conspiracy

There are "two aspects of knowledge involved in a conspiracy: 1) knowing participation or membership in

---

**6.** Because we find that Kagan's physical condition did not result in an involuntary waiver of his right to testify, we have no occasion to decide whether a deprivation of the right to testify is subject to a harmless error analysis. *Cf. Frey v. Schuetzle*, 151 F.3d 893, 898 n. 3

(8th Cir.1998) (declining to reach question of whether "harmless error analysis applies to the denial of a defendant's right to testify" in a case where the defendant knowingly and voluntarily waived his right to testify).

the scheme charged and 2) some knowledge of the unlawful aims and objectives of the scheme." *United States v. Lanza,* 790 F.2d 1015, 1022 (2d Cir.1986). Conscious avoidance may not be used to support a finding as to the former, i.e., intent to participate in a conspiracy, but it may be used to support a finding with respect to the latter, i.e., knowledge of the conspiracy's unlawful goals. *See United States v. Eltayib,* 88 F.3d 157, 170 (2d Cir.1996); *United States v. Scotti,* 47 F.3d 1237, 1243 (2d Cir.1995) ("The reason that we do not permit conscious avoidance instructions on the issue of knowing participation in a conspiracy is that it is logically impossible for a defendant to intend and agree to join a conspiracy if he does not know that it exists."). Vieira maintains that the district court's instructions on conspiracy impermissibly allowed the jury to find that he intended to participate in the conspiracy based on conscious avoidance.

Reading the charge as a whole—as we must, *see Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)—we conclude that the jury was properly instructed that conscious avoidance could only be used to infer knowledge of the conspiracy's unlawful objectives, and not of intent to participate in the conspiracy.

The district court first instructed the jury on the substantive crimes charged in the indictment and only later provided instructions on the conspiracy count. In the instructions on the substantive counts, the court gave the jury the following, standard, definition of "knowingly:" "A person acts 'knowingly' if he acts intentionally, voluntarily, and deliberately and not because of a mistake or accident, mere negligence, or other innocent reason." Jt.App. at 1411. After this definition of knowledge, but before the conspiracy instruction, the court instructed the jury on conscious avoidance. The court made clear, however, that the conscious avoidance instruction applied only to the substantive counts. By obvious implication, therefore,

the instruction did not apply to the conspiracy charge.

The court went on to tell the jury that in order to find a defendant guilty of conspiracy, it was required to find (1) an agreement, (2) that the defendant "knowingly, willfully, and unlawfully became a member of the conspiracy," and (3) "at least one overt act in furtherance of the conspiracy." Jt.App. at 1415. The court stated:

[¶ 1] The second element that the Government must prove beyond a reasonable doubt is that the defendant you are considering knowingly, willfully and unlawfully became a member of the conspiracy. *I have already defined the terms "knowingly," "willfully" and "unlawfully" and you must use those definitions here.* Thus, if you find beyond a reasonable doubt that the conspiracy charged in the indictment existed, you must determine whether the defendant you are considering was a member of that conspiracy.

[¶ 2] In determining whether the defendant you are considering became a member of the conspiracy, you must determine not only whether he participated in it, but whether he did so with knowledge of its unlawful purposes....

. . . . .

[¶ 3] In determining whether the defendant you are considering joined the conspiracy with knowledge of the [un]lawful objectives you have found that the conspiracy had, you may consider whether that defendant deliberately closed his eyes to what otherwise would have been obvious. The necessary knowledge cannot be established by showing that the defendant you are considering was careless, negligent or foolish. However, one may not willfully and intentionally remain ignorant of a fact material and important to his own conduct in order to escape the consequences of the criminal law. If you find beyond a reasonable doubt that the defendant you are considering was aware of a high probability

that the object or objects you have already found existed—for instance, ... that the premium finance agreements would be submitted to premium finance companies as part of a scheme to defraud those companies ...—but deliberately and consciously avoided confirming their existence, then you may treat this deliberate avoidance of positive knowledge as the equivalent of knowledge, unless you find that the defendant you are considering actually believed that these objects did not exist.

Jt.App. at 1416–17 (emphasis added).

▮ Vieira contends that the court's incorporation of its prior definition of "knowingly" in the instruction on conspiratorial intent permitted the jury to find that he possessed the requisite intent to participate in the conspiracy through conscious avoidance. But it seems clear that the district court's reference, in what we have numbered ¶ 1 of the conspiracy instruction, to its prior's definition of "knowingly," incorporates only the previously-given standard definition of knowingly and not the previously-given conscious avoidance definition which, by its own terms, applied only to the substantive counts. And this is made even more clear by the court's explanation in ¶ 3 that, as to knowledge of the *unlawful objectives* of conspiracy, the jury could infer knowledge from conscious avoidance. That is, when it was proper—in the context of the conspiracy charge—for the jury to infer knowledge based on conscious avoidance, the instructions explicitly so provided. It follows that the charge did not permit the jury to infer knowing *participation* in the conspiracy based on conscious avoidance.

▮ Moreover, even if the instructions could be construed to permit the jury to find knowing participation in the conspiracy based on conscious avoidance—which they do not—the instructions still do not permit the jury to find intent to participate in the conspiracy based on conscious avoidance. This is so because the charge also required the jury, in order to conclude that the defendant possessed the requisite intent, to find that he "willfully" became a member of the conspiracy. And the court explained that "[a] person's conduct is 'willful' if it is knowing *and purposeful* and if a person acts with the general knowledge that his conduct is unlawful *and with the intention* to commit an act which the law forbids." Jt.App. at JA1411 (emphasis added). Although this definition of "willful" includes references to knowledge, it also clearly and conjunctively requires a finding of intentional purposefulness. Hence, the conspiracy instruction read as a whole affirmatively required a finding of purposefulness and cannot be taken to permit the jury to infer the necessary intent to join the conspiracy from mere conscious avoidance. *See United States v. Beech–Nut Nutrition Corp.,* 871 F.2d 1181, 1196 (2d Cir.1989) (holding that any error was not reversible where "the charge as a whole properly instructed the jury that conscious avoidance could satisfy only the knowledge element of the offense [i.e., knowledge of the conspiracy's unlawful objectives] or the knowledge component of the intent element" and the instruction required a finding of wilful intent to participate in the conspiracy). There is therefore no basis to reverse Vieira's conviction for conspiracy.

### b. factual predicate for charge

Vieira also contends that the charge was erroneous because the requisite factual predicate for the charge did not exist. Because he challenges only the conscious avoidance instruction on the conspiracy count, the issue before us is whether "the evidence would permit a rational juror to conclude beyond a reasonable doubt 'that the defendant was aware of a high probability'" of the fact that the premium finance loans were fraudulent, that is, that Vieira was aware of at least one of the conspiracy's allegedly unlawful objectives, "and consciously avoided confirming that fact." *United States v. Hopkins,* 53 F.3d 533, 542 (2d Cir.1995) (quoting *Rodriguez,*

983 F.2d at 458) (internal quotation marks omitted); *see also Lanza,* 790 F.2d at 1022–23 ("While it is not necessary to a conviction for conspiracy for the government to prove that the accused knew all of the unlawful aims and objectives of the scheme charged, the government must demonstrate that the accused had *some* knowledge of its unlawful aims.").

We conclude that the evidence does not establish the requisite factual predicate for the charge. The evidence shows that Vieira actually knew of the frauds; it is not sufficient to permit a finding that he consciously avoided confirming them. The fact that a jury can—on the evidence—find actual knowledge does not mean that it can also find conscious avoidance. If conscious avoidance could be found whenever there was evidence of actual knowledge, a jury could be given a conscious avoidance instruction in a case where there was only equivocal evidence that the defendant had actual knowledge and where there was no evidence that the defendant deliberately avoided learning the truth. Under those circumstances, a jury might conclude that no actual knowledge existed but might nonetheless convict, if it believed that the defendant had not tried hard enough to learn the truth. Since we have held that conscious avoidance cannot be established when the factual context *"should have apprised* [the defendant] of the unlawful nature of [his] conduct," *Rodriguez,* 983 F.2d at 458 (quoting *United States v. Joyce,* 542 F.2d 158, 161 (2d Cir.1976) (internal quotation marks omitted))—and have instead required that the defendant have been "shown to have *decided* not to learn the key fact," *id.*—such a result might constitute reversible error. *But cf. Adeniji,* 31 F.3d at 63 (suggesting, as an alternate to its harmless error holding, that even though the factual predicate for a conscious avoidance instruction did not exist, where the instruction itself contained no errors, a guilty verdict could be presumed to be on another basis and hence not to be reversible). Because the record does not show that Vieira consciously avoided learning of the fraudulent loans—and the government nowhere asserts that it does—the charge given was improper. *See Adeniji,* 31 F.3d at 63.

The error in the jury instruction was, however, harmless in the instant case because there was overwhelming evidence that Vieira actually knew of the fraudulent nature of the loans and the jury was properly instructed on actual knowledge. *See id.* (finding that an erroneous conscious avoidance charge constituted harmless error where "there was overwhelming evidence" of defendant's actual knowledge). In 1995, Vieira was present at many meetings at which the co-conspirators gathered to discuss UFG's cash flow shortage and in particular its difficulty in servicing the monthly payments on the fraudulent premium finance loans. Some of these meetings were held in his apartment. At one of these meetings, Kagan described the mechanics of how the group might deceive an inquisitive premium finance company and suggested that he would have one of his employees answer any such call in a manner that would deflect suspicion. The record does show that Vieira was excluded from some of the financial condition meetings because Ferrarini was concerned that he would blow the whistle if he learned just how bad things were. But there is no dispute that Vieira knew of the *existence* of UFG's "black hole," that is, that he knew that UFG had taken "fraudulent moneys . . . into income." Jt.App. at 303. Additionally, Vieira was present when Ferrarini mentioned to the co-conspirators at UFG that they would have to pay Kagan for his assistance in procuring the fraudulent CPF loans. "Accordingly, the evidence of actual knowledge is manifest and, therefore, any error caused by the inclusion of the conscious avoidance instruction was harmless." *Adeniji,* 31 F.3d at 64.

Nor is this conclusion troubled by the fact that the jury acquitted Vieira of the two substantive counts of mail fraud with

which he was charged, both of which related to two loans from Imperial in 1993. The evidence of actual knowledge discussed above relates to a later part of the conspiracy and is overwhelming with respect to Vieira's actual knowledge as to the CPF loans in 1995. His acquittal, perhaps for lack of actual knowledge, on the 1993 Imperial loans, therefore does not undermine our conclusion that, two years later, Vieira manifestly had actual knowledge of the fraudulent nature of the CPF loans. Accordingly, we affirm Vieira's conviction on the conspiracy count.

### 2. Kagan

Kagan also contends that the conscious avoidance charge constitutes error warranting reversal of his conviction on his substantive mail fraud counts and conspiracy counts.[7] Specifically, he maintains (1) that he never claimed a lack of a specific aspect of knowledge required for conviction and (2) that the factual predicate for the instruction did not exist. We need not reach his first contention because, for the second reason he gives, the charge was indeed erroneous. This is so because the only factual predicate for conscious avoidance to which the government can point is the evidence that Kagan had actual knowledge of the frauds. Once again, the government does not argue, and the evidence does not show, that Kagan deliberately avoided learning the truth. Accordingly, and for the reasons discussed with respect to Vieira, the instruction should not have been given. We conclude, however, that here too the error was harmless because there was evidence beyond peradventure that Kagan, like Vieira, actually knew the loans were fraudulent. He was present at all of the meetings described above at which Vieira was also present, except for the one at which the kickback to Kagan was suggested. Moreover, if Kagan himself proposed the logistics for deceiving a suspicious premium finance company, there can be no doubt on the facts before us that he had actual knowledge of the fraudulent nature of the premium finance loans.[8]

### C. Financial Institution

Over the objection of all four defendants, the district court found CPF to constitute a "financial institution" within the meaning of the Sentencing Guidelines and therefore enhanced each defendant's sentence by four levels. *See* United States Sentencing Commission, Guidelines Manual ("U.S.S.G."), § 2F1.1(b)(7)(A) (1998) (providing for a four-level increase if the offense of conviction involved fraud or deceit and "substantially jeopardized the safety and soundness of a financial institution")

Application Note 16 to U.S.S.G. § 2F1.1 defines "financial institution"

> to include ... any state or foreign bank, trust company, credit union, insurance company, investment company, mutual fund, savings (building and loan) association, union or employee pension fund; any health, medical or hospital insurance association; brokers and dealers registered, or required to be registered, with the Securities and Exchange Commission; futures commodity merchants and commodity pool operators registered, or required to be registered, with the Commodity Futures Trading Commission;

---

7. The government contends that Kagan's claim, unlike Vieira's, is governed by the plain error standard because Kagan failed to object to the charge at trial. While it is true that Vieira made the oral and written arguments objecting to the charge, Kagan explicitly joined in them. Accordingly, we conclude that he adequately raised to the conscious avoidance issue below.

8. Kagan argues that he had no notice of the conscious avoidance charge and could not therefore structure his defense accordingly. The government, however, had submitted its requested instructions before the trial and had specifically included a proposed conscious avoidance instruction as to the substantive counts. Kagan's contention is therefore frivolous.

and any similar entity, whether or not insured by the federal government.[9]

U.S.S.G. § 2F1.1, comment. (n. 16).

Clearly, premium finance companies are not among the entities expressly enumerated in the Application Note. As a result, all four defendants renew their argument, that a premium finance company is not a "financial institution," and, therefore, that CPF's demise, due to UFG's fraudulent loans, does not justify the sentencing enhancement imposed on them.

In this respect, they first contend that the Sentencing Commission exceeded its statutory mandate when it declined to limit the definition of "financial institution," in Application Note 16 of U.S.S.G. § 2F1.1, to entities that are federally insured. They then assert that even if the Guidelines' broader definition of "financial institution" were permissible, the term still does not encompass a premium finance company such as CPF. Because these arguments raise purely legal questions, we review the district court's ruling *de novo. See United States v. Kirvan,* 86 F.3d 309, 311 (2d Cir.1996).

■ Defendants' first argument has some merit, but not enough to carry the day. In 1989, in the wake of the savings and loans crisis, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183. *See RTC Commercial Assets Trust 1995–NP3-1 v. Phoenix Bond & Indem. Co.,* 169 F.3d 448, 456 (7th Cir.1999). In Section 961(m) of FIRREA, Congress instructed the Sentencing Commission, pursuant to its authority under 28 U.S.C. § 994, which empowers the Sentencing Commission to establish appropriate sentencing ranges, to "promulgate guidelines, or amend existing guidelines, to provide for a substantial period of incarceration for a violation of, or a conspiracy to violate [various criminal prohibitions, including the provision criminalizing mail fraud] that substantially jeopardizes the safety and soundness *of a federally insured financial institution.*" § 961(m) of FIRREA, Pub.L. No. 101–73, 103 Stat. at 501 (emphasis added). Thereafter, the Sentencing Commission amended the Guidelines to include a four-level increase for offenses involving fraud or deceit that "substantially jeopardized the safety and soundness of a financial institution." *See* U.S.S.G. § 2F1.1(b)(7)(A) (1998).

In so doing, the Commission made explicit that the affected financial institution need not be federally insured for the enhancement to apply. *See id.,* comment. (n. 16). Clearly, then, the Guidelines definition of "financial institution," which includes non-federally insured entities, is broader than that contemplated by Congress when it enacted FIRREA. Indeed, the Sentencing Commission flagged the fact that it was "implement[ing], *in a broader form,* the instruction to the Commission in section 961(m) of [FIRREA]." U.S.S.G. § 2F1.1 Background (1998) (emphasis added). The question presented, therefore, is whether the Sentencing Commission had the legal authority to adopt this broader definition. We conclude that it did.

Through the Sentencing Reform Act of 1984, Pub.L. No. 98–473, § 217(a), 98 Stat. 2017–26 (codified at 28 U.S.C. §§ 991–98), "Congress ... delegated to the [Sentencing] Commission 'significant discretion in formulating guidelines' for sentencing convicted federal offenders." *United States v. LaBonte,* 520 U.S. 751, 757, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997) (quoting *Mistretta v. United States,* 488 U.S. 361, 377, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989)); *see also* 28 U.S.C. § 994(a); *Kirvan,* 86 F.3d

---

**9.** The Application Note also defines "financial institution" to include "any institution described in 18 U.S.C. §§ 20, 656, 657, 1005–1007, and 1014." These statutory provisions primarily reference various types of banks, including, *inter alia,* federal reserve banks, federal lending and credit institutions, credit unions, and agricultural credit associations. None of these code sections lists a premium finance company.

at 311 (recognizing that Congress expressly delegated rulemaking authority to the Commission). The Commission has broad authority, and is in fact required, under the Act to promulgate guidelines for the determination of sentences and "general policy statements regarding application of the [G]uidelines," in a manner that, *inter alia*, "reflect[s] the seriousness of the offense, . . . promote[s] respect for the law, and . . . provide[s] just punishment for the offense." 28 U.S.C. § 994(a)(2); 18 U.S.C. § 3553(a)(2)(A).

As a result, FIRREA, is not the sole source of the Commission's authority to define a "financial institution." The broad definition found in § 2F1.1(b)(7) and in the Application Note was, we conclude, promulgated not so much pursuant to FIRREA, but in the exercise of the Commission's general statutory powers under § 994(a) of the Sentencing Reform Act. *See* U.S.S.G. ch. 1, pt. A, intro. comment 1. Under that section, the Commission was authorized to develop guidelines—like the one at issue here—that reflect the seriousness of the offense at issue, to promote respect for the law criminalizing that offense, and to provide just punishment for it. *See* 28 U.S.C. § 994(a). We therefore hold that the Commission was fully empowered, under the Sentencing Reform Act, to adopt the definition of "financial institution" currently contained in the Guidelines, even though the definition is broader than that suggested in FIRREA.[10] *See United States v. Lauer*, 148 F.3d 766, 769 (7th Cir.1998) (Posner, *Chief Judge*)

(finding that the Guidelines' definition of "financial institution" was broader than that suggested in FIRREA, but that the Sentencing Commission appropriately acted in its delegated capacity in defining "financial institution" to include entities that are not federally insured).[11]

■ Because the Sentencing Commission was authorized to adopt the existing definition of "financial institution" in Application Note 16, we must next determine whether a premium finance company falls within that definition. Since a premium finance company is not among the entities explicitly listed in the Application Note, the question before us is whether such a company qualifies as "any similar entity, whether or not insured by the federal government," for these are also covered by the guideline. *See* U.S.S.G. § 2F1.1, comment. (n. 16).

Defendants maintain that, in light of FIRREA and the other types of institutions listed in the Application Note, the enhancement is intended to apply only when the demise of the institution at issue causes a financial loss to the public. And, according to defendants, due to the unique structure of premium financing, CPF's liquidation caused no harm to the public.

Surprisingly, no circuit court has yet ruled on what the Sentencing Commission meant when it defined a "financial institution." *Cf. United States v. Schinnell*, 80 F.3d 1064, 1070 (5th Cir.1996) ("Unfortunately, there is scant authority among the courts of appeal construing" a related pro-

---

**10.** We need not reach the questions of whether, and, if so, under what circumstances, the Commission can abuse its statutory discretion under the Sentencing Reform Act. In this case, defendants assert only that the Commission exceeded its authority under FIRREA.

**11.** Defendants' appeal to the Supreme Court's decision in *LaBonte* is unavailing. In that case, the Supreme Court held that language in the Commentary to the Guidelines that was *inconsistent* with a federal statute could not stand. *LaBonte*, 520 U.S. at 753, 117 S.Ct. 1673. Thus, *LaBonte* stands for the incontrovertible proposition that "[i]f the Commis-

sion's revised commentary is at odds with [a statute's] plain language, it must give way." *Id.* at 757, 117 S.Ct. 1673. In this case, however, the Application Note's definition of "financial institution" is not "at odds" with FIRREA; it goes further than FIRREA, and this, the Commission was fully authorized to do. *See United States v. Jackson*, 60 F.3d 128, 133 (2d Cir.1995) (holding that § 994(a) of the Sentencing Reform Act "vested the Commission with authority to expand the [statutory] definition of 'controlled substance offense' to include aiding and abetting, conspiring, and attempting to commit such offenses").

vision under the Guidelines, enhancing by four levels for an offense involving fraud or deceit that " 'affect[s] a financial institution and [from which] the defendant derived more than $1,000,000 in gross receipts' ") (quoting U.S.S.G. § 2F1.1(b)(7)(B)). And the only decision, to our knowledge, dealing directly with premium finance companies, is an unpublished one by the Western District of Missouri in which the court equivocally and, with little analysis, found such a company not to constitute a "financial institution" within the Guidelines, *see United States v. Uffman,* No. 94–00139–01–CR–W–6, 1994 WL 504601 (W.D.Mo. Sept.9, 1994)—a conclusion we reject.

We note, first, in passing, that defendants' effort to limit "financial institutions" to those entities whose collapse would injure the public stems from reading the Application Note in conjunction with FIRREA. But, as discussed above, the Application Note was promulgated pursuant to the Commission's authority under the Sentencing Reform Act and explicitly adopts a definition that is broader than that contemplated in FIRREA. FIRREA, therefore, and its concern with the insolvency of federally insured financial institutions do not provide a limiting principle on the Guidelines' definition of "financial institution."

But even assuming, *arguendo,* that the Application Note's definition of financial institutions is limited to those entities whose peril would in turn "create monetary losses to the public," Brief for Kagan at 38, the record does not support defendants' contention that CPF does not qualify. It is simply not the case that "the *only* entity adversely affected by CPF's insolvency was CPF." Brief for Rumignani at 33. It is true, as defendants point out, that CPF's loans were, in general, fully secured by the down payment made by the insured and CPF's right to any unearned

premium. And defendants are correct to state that neither the insureds who borrowed from CPF, nor the insurance companies which had already been fully paid at the start of the policy year were directly harmed by CPF's collapse. But CPF itself was a borrower and its lenders were, in turn, banks, such as the Bank of Montreal, Cigna Bank, and the National Bank of Georgia. As a premium finance company, CPF was, in fact, precisely in the business of borrowing money from parties, whom it was obligated to repay, and of lending out that borrowed money at a higher interest rate.[12] It was, in that respect, very like a bank. *See* Webster's Third New International Dictionary, Unabridged 172 (1993) (defining "bank" as "an establishment for the custody, loan, exchange, or issue of money, for the extension of credit, and for facilitating the transmission of funds by drafts or bills of exchange; … an institution incorporated for performing one or more of such functions").

When defendants' company, UFG, was no longer able to pay its debts, it owed CPF some $4.9 million in principal and interest. Under the terms of CPF's agreements with its own lenders, CPF was then required to repurchase the bad loans it had made. Unable to do so, CPF eventually liquidated its assets. And while CPF "tried" in the process "to maximize the return for the sake of our lenders," those lenders "were obviously out some money." Jt.App. at 613. The record, therefore, plainly belies defendants' contention that no one, save CPF, was affected by CPF's insolvency.

We conclude that premium finance companies, including CPF, are entities whose financial peril endangers the general public and whose functions are sufficiently bank-like to constitute financial institutions within the meaning of Application Note 16, which on its face includes varied and sun-

---

**12.** It was, in this respect, very different from, say, a department store that, in order to sell goods, gives its customers a line of credit, even if the moneys for that line of credit are themselves provided to the store by a bank.

dry forms of banks and "any similar entity, whether or not insured by the federal government." U.S.S.G. § 2F1.1, comment. (n.16). For, as the Seventh Circuit put it, "when it walks and talks like a financial institution, ... it is, in our view, covered by [§ 2F1.1(b)(7) ]." *United States v. Randy*, 81 F.3d 65, 69 (7th Cir.1996) (finding that a "phony" bank that was nevertheless "licensed as a bank by Montserrat and licensed by Grenada as a company with broad banking powers" was a "financial institution" within the meaning of § 2F1.1).

### III. CONCLUSION

Because the record supports the conclusion that Kagan's medical condition did not preclude him from testifying, we reject the argument that his constitutional right to testify was violated by the district court's denial of his motion for a medical adjournment or severance. And although we agree with both Vieira and Kagan that the district court erred in instructing the jury on conscious avoidance, we conclude that these errors were harmless. Finally, we find that the Sentencing Commission was statutorily authorized, pursuant the Sentencing Reform Act, to promulgate a Guidelines definition of "financial institution" broader than that found in FIRREA and that a premium finance company is a "financial institution" within the meaning of that Guidelines definition.

For the foregoing reasons, and for those articulated in the accompanying summary order, we AFFIRM the convictions and sentences of all four defendants.