A.M. KAGAN, Plaintiff,

v.

UNUM PROVIDENT, Defendant.

Case No. 03–CV–8130 (KMK).

United States District Court,
S.D. New York.

March 31, 2011.

Jonathan Christopher Corbett, Esq., Joshua Lee Mallin, Esq., Weg & Myers, P.C., New York, NY, for Plaintiff.

Patrick Walter Begos, Esq., Begos Horgan & Brown, LLP, Westport, CT, for Defendant.

## OPINION AND ORDER

KENNETH M. KARAS, District Judge.

Plaintiff A. Michael Kagan ("Kagan") brings this action against Defendant Unum Provident ("Unum") for wrongful denial of disability benefits pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*[1] Plaintiff has now moved for summary judgment and Defendant has submitted papers in anticipation of a bench trial on the administrative record. For the reasons stated herein, Plaintiff's motion is denied, and judgment will be entered in favor of Defendant.

### I. Background

#### A. Facts

Kagan was, until 1998, the President and Manager for Sales Insurance of KBC Systems Corporation ("KBC") in Mamaroneck, New York. (FULCL 9, 14.)[2] According to an Education and Employment History form filled out by Kagan in June 2002, his primary duties while in his position at KBC included "[t]ravel[ing] to business meetings" and "[selling] insurance, while at client's premises." (FULCL 573.) Unum issued a Plan of coverage for KBC in 1995 (the "Plan"). (FULCL 790–92.) The Plan provided that Unum would pay disability benefits to KBC employees "when [Unum] receive[d] proof that the employee "(1) [was] disabled due to sickness or injury; and (2) require[d] the regular attendance of a physician." (FULCL 779.) A rider to the Plan defined "disability" as follows:

> "Disability" and "disabled" mean that because of injury or sickness:
>
> a. you cannot perform each of the material duties of your regular occupation; and
>
> b. after benefits have been paid for 24 months, you cannot perform each of the material duties of any gainful occupation for which you are reasonably fitted by training, education or experience.

(FULCL 791.)[3]

Kagan had a history of high cholesterol and smoked two packs of cigarettes per

---

1. The correct name for the Defendant company appears, from its opening brief, to be First Unum Life Insurance Co. (Def.'s Opening Trial Br. (Dkt. No. 47) 1.) The Court will refer to the Defendant as "Unum."

2. The administrative record in this case is made up of seven volumes of documents, running over 2000 pages. Volumes One through Three contain documents Unum reviewed in deciding Kagan's initial benefits claim, and are designated "FULCL ——." Volumes Four through Seven contain documents from Unum's 2006 reassessment of Kagan's benefits claim, and are designated "FULCL–RSA/CRU ——" (hereinafter "RSA/CRU" for clarity). Volume Seven also contains four pages of documents labeled "KHG." The Court will cite the administrative record using the format "["FULCL" or "RSA/CRU"] [page number]."

3. This language indicates that, for any time after benefits had been paid for 24 months, the Plan was a so-called "general" disability policy, under which to be disabled, "the claimant must be unable to perform any job for which []he is reasonably qualified," as opposed to an "occupational" disability policy, under which a claimant is disabled if he is "unable to do the tasks required to perform [his] regular job." *Meyer v. Ins. Co. of Am.*, No. 97-CV-4678, 1998 WL 709854, at *7 (S.D.N.Y. Oct. 9, 1998) (citing *Hammond v.*

day for over thirty years. (FULCL 23.) On July 22, 1998, Kagan was admitted to the hospital after experiencing two temporary losses of consciousness. (FULCL 23–24.) After a series of examinations suggesting Kagan suffered from, among other heart conditions, ischemic cardiomyopathy (congestive heart failure due to coronary artery disease) (FULCL 19–21), Kagan was referred to "urgent bypass surgery" five days later, (FULCL 18). Kagan underwent quadruple bypass surgery on July 27, 1998. (*Id.*) Kagan was discharged on August 10, 1998, after a defibrillator was implanted into his chest. (FULCL 16–17, 219.)

Kagan applied for benefits from Unum on September 17, 1998. (FULCL 2, 5–9.) Two relevant forms followed Kagan's application: a Job Analysis form dated September 26, 1998, on which Kagan listed his job as "President" and "Manager/Sales Insurance" of KBC, but did not give further details (FULCL 14);[4] and a Physician's Statement completed by Dr. Mark Warshofsky, Kagan's treating physician during his initial hospitalization, who indicated that Kagan should avoid "physically demanding or mentally stressful activities" and that Kagan "w[ould] not have a complete recovery." (FULCL 25.) Unum initially approved Kagan's benefits claim on October 21, 1998, while continuing to gather financial information in order to determine the precise amount Kagan would be paid in benefits long-term. (FULCL 36–37.) Unum's approval letter noted that Kagan would also be required to apply to the Social Security Administration ("SSA")

for Social Security Disability Insurance ("SSDI") benefits if his disability was projected to last longer than five months. (FULCL 37.) This Kagan did and he began to receive SSDI benefits in January 2009. (FULCL 348–49.)

Kagan was clearly not well even following his surgery. An Unum report of a phone conversation with him on December 4, 1998, indicated "labored breathing" and that Kagan "had to stop talking every once in a while to catch his breath." (FULCL 795.) An interviewer for the SSA indicated the same thing on December 30, 1998. (RSA/CRU 290–91.) One of his doctors predicted that his physical condition would likely "preclude him from further significant physical activities." (RSA/CRU 965.) Between May 7 and 11, 1999, Kagan was hospitalized at White Plains Hospital (FULCL 335, 352), due to multiple "defibrillation events" and "shocks," (FULCL 345, 353). According to a May 7–8, 1999 medical history form signed by Dr. Paul Pechman ("Dr. Pechman") on Kagan's admission to White Plains Hospital Center, Kagan had "shortness of breath with minimal exertion and frequently at rest," "chronic obstructive pulmonary disease," and suffered from "decreased attention span and concentration ability since his hospitalizations and procedures." (FULCL 354.) Even after his hospitalization, Kagan's condition apparently remained poor. According to notes of a phone call between an Unum employee and Kagan's wife on July 29, 1999, Kagan still felt "very weak [and] very fatigued all

---

*Fidelity & Guar. Life Ins. Co.*, 965 F.2d 428, 430–31 (7th Cir.1992)); *see also Demirovic v. Bldg. Serv. 32 B–J Pension Fund*, 467 F.3d 208, 213 n. 4 (2d Cir.2006) ("The plan at issue here is an example of a 'general' disability plan, in which a participant is considered able-bodied if she is able to perform any gainful employment, as opposed to an 'occupational' plan, in which a participant is consid-

ered able-bodied only if she is able to perform the duties of her particular occupation.").

**4.** On his application for Social Security benefits, Kagan described his position as an "Insurance Broker," and stated that the job required no lifting and "varied" amounts of walking, standing, and sitting. (RSA/CRU 294.)

of the time." His daily activities consisted of "not much of anything," as it was "[t]oo hard for him to get around." (FULCL 345.) Internal Unum memos from February and June 1999 indicate that Kagan's "rtw [return to work] capacity is poor." (FULCL 801, 807.) In a September 7, 1999 medical review completed by Unum, Kagan's condition was listed as "preclud[ing] work capacity." (FULCL 363.)

In May 1999, Kagan was convicted, after a jury trial, of over thirty counts of mail fraud and conspiracy and sentenced to 70 months' imprisonment. *See United States v. Kagan*, 97–CR–950–003 (DLC) (S.D.N.Y. judgment entered May 21, 1999) ("*Kagan* Judgment");[5] *see also United States v. Ferrarini*, 219 F.3d 145, 147–51 (2d Cir.2000) (affirming Kagan's conviction).[6] Kagan began serving his sentence in July 1999. *See Kagan* Judgment, *supra*. During his incarceration his Social Security benefits were stopped. (RSA/CRU 1127.)

Kagan received a medical review upon his entry into a prison medical facility on July 9, 1999. (RSA/CRU 831.) The summary report of that episode, dated September 30, 1999, lists Kagan's "condition on discharge" as "[s]table" and recommended physical activity "[a]s tolerated by [the] patient." (RSA/CRU 834.) The report also allowed Kagan to be placed on "[r]egular duty" in prison, with the restriction that he be given only "sedentary work." (RSA/CRU 835.)[7]

Kagan was incarcerated between July 1999 and June 2004 at a federal institution in Otisville, New York ("Otisville"), and received treatment at Horton Medical Center ("Horton"), in nearby Middletown. (FULCL 376, 378; RSA/CRU 29.) Some of Kagan's Horton visits appear to have been related to the implanted defibrillator Kagan received following his bypass surgery, as the records describing them are headed "Pacemaker Clinic." (*E.g.*, FULCL 542, 557.)[8] At a June 2000 checkup, Kagan was told to "avoid prolonged exertion, especially in heat," as such activity could lead to arrhythmia (essentially, abnormal heartbeat). (FULCL 559.) Notes from March 2001 checkups indicate a diagnosis of no active pulmonary disease but chronic obstructive pulmonary disease. (FULCL 511–12.) In late March 2001, Kagan reported "increased [and] persistent shortness of breath," "palpitations," and dizziness. (FULCL 558.) But a report of an exam conducted March 19,

**5.** The *Kagan* Judgment appears in the record at Decl. of Jonathan C. Corbett ("Corbett Decl.") (Dkt. No. 44) Exh. G at unnumbered pgs. 18–19.

**6.** Kagan appealed his convictions to the Second Circuit, arguing, among other things, that the district court's denial of his motion for severance or adjournment of the trial due to his heart problems deprived him of his right to testify on his own behalf. *Ferrarini*, 219 F.3d at 151. The Second Circuit rejected this argument. Judge Cote had found that Kagan suffered no mental condition that would interfere with his ability to decide whether to take the stand, and that his health conditions did not undermine his ability to testify. *Id.* at 152–53. The Second Circuit concluded these findings were "amply supported by the evidence in the record," particularly expert testimony from both the Government's and Kagan's physicians. *Id.* at 153. Unum would later reference the *Ferrarini* decision in its February 23, 2007 letter denying Kagan benefits following reassessment of his claim. (RSA/CRU 1093.)

**7.** Kagan had previously not been cleared for a temporary work assignment pending a medical evaluation on July 9, 1999. (RSA/CRU 839.)

**8.** The administrative record contains evidence indicating that Kagan suffered multiple other ailments unrelated to his heart and respiratory problems, such as joint and back problems. (*E.g.*, FULCL 537, 550.) In this litigation Kagan has not relied on these medical issues as evidence that he was "disabled" within the meaning of the Plan.

2001 indicates that Kagan "denie[d] any chest pain or discomfort," that he had "[n]o shortness of breath," and "[n]o recent history of palpitation, dizziness, or feeling of passing out." (FULCL 593.) His discharge papers indicate no limitations on his physical activities, and that he was to "resume normal activities for [his] level, (as before)." (FULCL 558.)

The administrative record also contains records of Kagan's attendance at a "Cardiac Clinic" as well as other medical notes taken during his time in prison up until May 2004.[9] (It is unclear whether the Cardiac Clinic was at Horton or Otisville.) There are records of visits at the Cardiac Clinic taking place every few months. The March 17, 2000 diagnosis listed, among other things, coronary artery disease, and Kagan was designated with a "New York Heart Association Classification" of "Class I" ("Ordinary physical activity does not cause undue fatigue, dyspnea[ [10]] or anginal pain"). (FULCL 484.) Kagan indicated he undertook "moderate activity" and said he felt "OK." (FULCL 485.) That April, Kagan indicated he had "a tight chest" and that it felt "like its [*sic* ] 'cracking.' " (FULCL 464.) But on May 25, 2000, Kagan reported having " 'zero' chest pain," "no irregular heart beat," that he was "not feeling any rapid heart beat," and that he "g[ot] SOB [shortness of breath] only when he takes a long walk." He did complain, however, of "vertigo," dizziness, and pain in his legs after standing too much. (FULCL 472–73.) By June 2000, Kagan again said he felt "ok," and that he was working as an "orderly" in the prison. (FULCL 453.) His Heart Association classification, however, was downgraded to "Class II" ("Ordinary physical activity results in symptoms"). (FULCL 452.) In September 2000, Kagan was again given a

Class II classification; the notes of those checkups do not illuminate the reasons. (FULCL 462.) The notes on Kagan's December 2000 checkup indicate that he was again working as an "orderly" and was doing "well." The Class II designation was maintained. (FULCL 442–43.) Kagan continued to complain of "chronic dizziness" through January 2001. (FULCL 448).

By the June 2001 Cardiac Clinic, Kagan's condition appears to have improved. Notes from a June 18, 2001 checkup indicate no medical complaints or concerns, that Kagan was "clearly well," and that his condition had a "minimal" impact on the "[a]ctivities of [d]aily [l]iving." (FULCL 417.) The diagnosis still listed "[c]ardiac [d]isease," but Kagan received a Class I classification. (FULCL 416.) In September 2001, by which time his medical notes indicate Kagan was doing "[d]aily walking" and "stretching," Kagan was complaining of "much pain," and the diagnosis indicated "varicosities" in his lower legs. Still, his heart classification remained at Class I. (FULCL 409–10.) In December 2001, Kagan "fe[lt] well," and only experienced problems "walking up stairs" and "hills." He had no shortness of breath, and only occasional chest pain "which doesn't last." He maintained a Class I classification and a "gradual increase in exercise activity" was suggested. (FULCL 403–04.) At an April 2, 2002 checkup, Kagan complained of a "large fatty breast," a "degenerative joint disease," and "bad experiences with his implanted defibrillator." He "[a]dmit[ted] to feeling fine" and "denie[d] any [shortness of breath], chest pain, [or] palpitation." (FULCL 396.)[11] The only diagnosis from this checkup under the heading "Cardiac" was the word "stable," and the notes indicate that Kagan would be

---

**9.** These notes are for the most part entirely handwritten in multiple, different hands.

**10.** *"Dyspnea,"* a term appearing frequently in Kagan's health records, means "difficult or labored respiration." *Dyspnea,* Merriam–

Webster Medical Dictionary. Online, http://www.merriam-webster.com/medlineplus/dyspnea (last visited Mar. 29, 2011).

**11.** The notes from December 2001 on do not contain a Heart Association Classification.

evaluated for a possible defibrillator check. (FULCL 395.) Kagan received a similar diagnosis following a June 7, 2002 checkup. (RSA/CRU 655.) Kagan's implanted defibrillator had a low battery in July 2002, resulting in Kagan's hospitalization on July 30, 2002. (RSA/CRU 444–45, 651, 654.) Prior to this episode, Kagan complained of shortness of breath while walking to his job. (RSA/CRU 649.) The doctor's notes indicate Kagan showed "no SOB [shortness of breath] [in] conversation . . . or walking," and "no sign or symptoms of cardiac or pulmonary disease," but his work assignment was changed until the battery could be replaced. (RSA/CRU 650.) The battery was replaced at Columbia–Presbyterian Medical Center by Dr. Jose Dizon ("Dr. Dizon") on July 30, 2002 (RSA/CRU 646), and Dr. Dizon reported Kagan was "doing fine" following the procedure, (RSA/CRU 645). Kagan left the hospital the next day. (RSA/CRU 645–46.)

Kagan reported feeling okay with some shortness of breath in October 2002. (RSA/CRU 639.) There are similar notations in Cardiac Clinic reports in 2003. (RSA/CRU 633 (January 2003) ("SOB but had always had SOB"); RSA/CRU 616 (October 2003) ("Vertigo at times. SOB as always.").) A July 8, 2003 note indicates that Kagan's breathing was "good" and "normal." (RSA/CRU 619.) The notes for the January 13, 2004 clinic state that Kagan reported feeling "constantly tired," having "vertigo at times," and that he had "SOB more often." (RSA/CRU 611.) In April 2004, shortly before he left Otisville, Kagan's "[b]reath [was] normal," and he was "walking for exercise." (RSA/CRU 607.)

Kagan worked while he was in prison. The prison records contain charts detailing in general terms the type of work Kagan did and, for the years 2003 and 2004, the hours he worked. (RSA/CRU 472–498.) [12] From his admission to Otisville in July 1999 through February 7, 2000, Kagan's work history indicates, apart from a few days in "food service," that he was either "unassigned," in an "unassigned work detail," or "medically unassigned" (the latter specifically from July 30 through October 28, 1999). (RSA/CRU 475–76.) Kagan received a medical clearance for "camp" in September, 1999. (RSA/CRU 1008.) Beginning on February 7, 2000, Kagan was a "visiting room orderl[y]," and the records list "camp orderly" as his work assignment from June 22, 2000 through June 17, 2002. (RSA/CRU 473.) The records do not give details regarding what the duties of an "orderly" were. The notations for July 2002 cryptically indicate "warehouse (out)," without explanation, along with approximately two weeks of medical non-assignment. (*Id.*) (These records correspond with the time period during which the battery in Kagan's defibrillator was low.) After an "unassigned" period lasting until August 21, 2002, Kagan began work in "camp education." This he continued, apparently without any medical leave, until May 2004. (RSA/CRU 472.)

For the work days between late March 2003 and May 2004, the prison records also include time sheets and work evaluations for Kagan in his job. Kagan apparently worked as a GED tutor. (*E.g.*, RSA/CRU 477.) The records consistently indicate that due to short-staffing, tutors were responsible for a "greater percentage of in-

---

**12.** The record contains only one document that provides some detail regarding what the notations on Kagan's work charts mean, and the document is poorly reproduced in the record. A listing of "medical idle" is a "temporary restrict[ion]," meaning that the patient is to "remain in room" and that "activities are restricted." (RSA/CRU 1068.) A listing of "medically unassigned" means that the inmate is "[n]ot assigned to work . . . injury, or due to serious medical or psych. . . ." (*Id.*) The remainder of the description is illegible.

struction" in certain classes, including for Pre–GED and GED students. (*E.g.*, RSA/CRU 497.) Kagan consistently received the highest or near the highest evaluations from his supervisors. (*Id.*) The time sheets indicate that Kagan worked 35 hours per week on average. (*E.g.*, RSA/CRU 498.) The records again do not provide details about what specifically Kagan's duties were as a tutor.

On April 10, 2002, as part of its continuing assessment of Kagan's claim for long-term benefits, an Unum employee spoke to Dr. Dizon.[13] Dr. Dizon informed Unum that he saw Kagan approximately every five months for about five minutes each time, and that during these visits he checked Kagan's defibrillator. (FULCL 739.) Dr. Dizon also "felt that [Kagan] was capable of [full time] sedentary capacity but [had] a hard time confirming this fact with no stress test." "[A]ccording to [Kagan's] information," Dr. Dizon reported, Kagan was "performing at least sedentary activity F/T [full time]" in the jail. (*Id.*) This was while Kagan was working as an orderly. (RSA/CRU 473.)

In May or June 2002, Dr. Dizon completed an "Estimated Functional Abilities Form" ("EFAF") in connection with Kagan's claim for benefits.[14] (FULCL 571.) The EFAF indicated that its findings were based on the "patient's report." (*Id.*) Dr. Dizon noted that Kagan could "[f]reqent[ly]" lift and carry up to ten pounds and reach above his shoulders; Kagan could also, on "occasion," bend, kneel, crawl, climb stairs, and push or pull up to forty pounds. (*Id.*) When asked to comment on potential limitations on Kagan's "functional ability," Dr. Dizon noted

only that Kagan had an automatic defibrillator, and that therefore Kagan's "exertion" should be "limited," as it could "set off [the] device." (FULCL 570.) In addition, Dr. Dizon reported that Kagan could perform up to eight hours of sedentary activity (defined as "[w]alking/standing on occasion" and "[s]itting 6/8 hours") and up to four hours of light activity (defined as "jobs involving standing with a degree of pushing and pulling"). (*Id.*) The form allowed Dr. Dizon to indicate whether Kagan needed breaks more frequently than once every two hours, but he provided no such notation. (*Id.*) Dr. Dizon noted that Kagan could work a total of eight hours and that Kagan's functional ability was "probably chronically limited." (*Id.*) Finally, Dr. Dizon stated that he saw Kagan "every 3–4 months," and that he was "unable [to] assess functional capacity fully." (*Id.*)

Unum paid benefits to Kagan until June 2002, at which time it terminated future benefit payments. By letter dated June 17, 2002, Unum notified Kagan of its determination that Kagan was not "disabled" within the meaning of the Plan. (FULCL 737.) The denial letter indicated that Unum had reviewed Dr. Dizon's medical file and Kagan's prison records. (*Id.*) These records were reviewed by two people at Unum: Sharon Davenport ("Davenport"), a registered nurse, and Dr. Lawrence S. Broda ("Dr. Broda"), Unum's Medical Director. (FULCL 729.) Davenport's review, dated May 21, 2002, concluded, based on Kagan's prison medical data, that the limitations listed by Dr. Dizon on the EFAF were reasonable.[15] (FULCL 729–30.) Davenport's review acknowl-

---

13. The record is of a conversation with "Dr. Dizam," but the Parties' memoranda of law indicate that Dr. Dizon was Unum's interlocutor.

14. This form is undated.

15. Davenport also considered a March 2002 "supplemental statement" from Kagan. (FULCL 731.) In this statement, Kagan indicated that his present activities consisted of "[r]eading and [r]esting." (FULCL 370.) In Dr. Dizon's portion of the statement, he de-

edged Dr. Dizon's caveat that he could not "fully" assess Kagan's functional ability. (*Id.*) In a handwritten notation dated May 22, 2002, Dr. Broda agreed with Davenport's conclusion: he noted that Kagan had "multiple medical problem[s]," but, based on Dr. Dizon's statements, Kagan had "sedentary work capacity full time." (FULCL 729.)

Unum also referred Kagan's case to an outside consultant for a "Transferable Skills Analysis" ("TSA"). (FULCL 734.) The TSA referenced Dr. Dizon's EFAF and Davenport's medical review. (*Id.*) It concluded that Kagan had "[b]usiness [m]anagement" and "[b]usiness [a]dministration" skills, and that Kagan was qualified and able to perform several occupations," including working in his previous capacity as an insurance sales manager, "that exist within the claimant's local labor market." (FULCL 733.) The analysis based this latter conclusion on several 1999 and 2002 studies, at least one of which surveyed the Yonkers, New York area. (FULCL 732–33.) The TSA listed seven jobs as a "representative sample" of ones existing within Kagan's local area for which he would be qualified based on his work history, education, skills, and medical limitations. (*Id.*)[16]

Kagan appealed Unum's denial of benefits internally. (FULCL 721.) The only new information Kagan submitted in connection with this appeal was a letter from Dr. Pechman dated September 10, 2002,

which stated that Dr. Pechman was "very familiar with Mr. Kagan's medical history" and that Kagan had been "totally and permanently disabled since July 21, 1998 secondary to his severe cardiac and pulmonary disease." (FULCL 718.) Unum denied Kagan's appeal on November 14, 2002. (FULCL 709.) Unum's denial letter summarized the same medical information, including Kagan's prison records, that Unum had reviewed in its initial evaluation of Kagan's claim. (FULCL 708.) As to Dr. Pechman's letter, Unum noted that "[t]here were no office visit notes or test results submitted with this letter," and that Kagan "ha[d] not seen Dr. Pechman in over a year as confirmed by his office." (FULCL 707.)[17] "Based on this review, it is our opinion that the medical records do not substantiate an impairment that would preclude you from doing your own occupation." (*Id.*)

Following the initiation of this action, Kagan sought reassessment of Unum's denial of his claim on January 12, 2006. (RSA/CRU 26, 35.) He contended that he had been "totally and permanently disabled" since his bypass surgery in 1998, relying on Dr. Pechman's consistent statements to that effect. (RSA/CRU 28.) He noted that his condition had worsened since 2002 as he had been prescribed three additional medications by Dr. Pechman in August 2004. (*Id.*) A January 6, 2006 letter from Dr. Pechman was attached to Kagan's reassessment request. It stated

---

scribed Kagan's condition as "Class 2—Slight limitation." He noted that he was "unable [to] fully evaluate [patient] as visits limited to brief periods out of prison." (FULCL 368.)

**16.** The TSA listed "Manager, Insurance Office," "Special Agent," "Risk & Insurance Manager," "Manager, Sales," "Supervisor, Customer–Complaint Service," "Supervisor, Order Takers," and "Supervisor, Claims." These jobs would pay between $18.06 and $35.35 per hour. Each was a sedentary job. (FULCL 732.)

**17.** In fact, the records from Dr. Pechman Unum would later receive in its reassessment of Kagan's claim do not contain any indication that Dr. Pechman saw Kagan from the beginning of Kagan's incarceration through April 2003. (RSA/CRU 123 (notes from an April 2003 visit indicating that Kagan was "on furlough from Otisville"); RSA/CRU 169 (results of an October 1998 test).)

that Kagan was "totally and permanently disabled since July 21, 1998," due to "severe cardiac and pulmonary disease"; that Kagan had "vertigo and poor memory and concentration," was "fatigued and require[d] frequent naps during the day"; and that Kagan suffered from "severe chronic obstructive pulmonary disease, congestive heart failure, chronic severe back and neck pain, and a torn rotator cuff." (RSA/CRU 38.) Kagan was therefore "unable to physically exert himself and [was] unable to work at all." (*Id.*) Kagan submitted similar letters written by Dr. Pechman dated August 2004, February 2004, April 2003, October 2003, and September 2002 (RSA/CRU 39, 43, 46–48.) [18] The February 6, 2004 letter indicates that Kagan's condition had "worsened substantially" since Kagan's visits in 2003, and that Kagan suffered from, among other ailments, "shortness of breath at rest" and an inability "to sit for extended periods." (RSA/CRU 48.) Included were reports signed by Dr. Pechman from May and September 2003 that had been submitted to other insurance companies. In these reports, Dr. Pechman indicated that Kagan would "never be able to resume any work" and was "permanently disabled," though his sickness did not confine him to his home. (RSA/CRU 44–45.) Kagan's reassessment papers also contained a notice from the SSA indicating that his disability payments had been paid since June 2004 following his release from prison. (RSA/CRU 49.)

To reassess Kagan's claim, Unum initially sought medical information from his treating physicians, including Drs. Dizon and Pechman, and from the SSA. (RSA/CRU 65, 74–79.) It became clear that Kagan was not reevaluated by the SSA when he was released from prison in 2004; rather, his benefits were simply reinstated. (RSA/CRU 263, 265.) Unum acquired notes from Dr. Pechman in May 2006. (RSA/CRU 113.) These records covered Kagan's visits with Dr. Pechman between April 2003, when Kagan was on furlough, through 2006. (RSA/CRU 123.) Dr. Pechman's records reveal a somewhat mixed picture: By 2006, Kagan continued to suffer from Chronic Obstructive Pulmonary Disease. (RSA/CRU 125.) Chest x-rays from 2004 through 2006 revealed an "[e]ssentially normal chest." (RSA/CRU 130; *see also* RSA/CRU 126.) A July 28, 2004 "pulmonary function report" indicated that Kagan suffered from "significantly lower" lung capacity than when he had been reviewed in 1998. (RSA/CRU 135, 169.)

Unum referred Kagan's file, with the new data, to Dr. Valencia Clay ("Dr. Clay"), Unum's Medical Director. She did not find "support for an impairment that would preclude [Kagan's] ability to perform a sedentary occupation." (RSA/CRU 265.) Kagan's records showed "significant improvement in cardiac function," said Dr. Clay. (RSA/CRU 253.) For this statement, she cited, among other things, medical reports and test results from 2001 and Dr. Dizon's functional capacity assessment contained in the 2002 EFAF. (*Id.*) Dr. Clay also noted that "[n]either cardiologist caring for Mr. Kagan" [19] "reported symptoms or physical findings that would sup-

---

**18.** There is another letter from Dr. Pechman in the record, dated June 21, 1999. (RSA/CRU 949.) It states that Kagan suffered from "shortness of breath at rest" and that he had "little tolerance for any physical activity." "In light of [Kagan's] medical condition, specifically congestive heart failure, history of arrhythmia, implantable defibrillator, and advanced chronic obstructive pulmonary disease, Mr. Kagan would not medically tolerate the stress of incarceration." Pechman also warned against any change in Kagan's medicines. (*See also* RSA/CRU 961 (Letter from Dr. Paul Pechman to Hon. Denise Cote (Apr. 29, 1999)) (nearly identical).)

**19.** Indicating, presumably, Drs. Dizon and Pechman.

port total impairment and neither opined a total loss of functional capacity." (*Id.*)

Following Dr. Clay's review, Unum sought authorization from Kagan to acquire his prison records. (RSA/CRU 266, 269.) After this was provided (RSA/CRU 367–68), Unum filed a FOIA request with the Bureau of Prisons ("BOP"), seeking Kagan's medical and work/activity records from 1999 through July 2004, (RSA/CRU 371). Unum also acquired additional records from Kagan's treating physicians dating back to 1999. (RSA/CRU 437, 443.) These documents confirmed that Dr. Dizon saw Kagan every few months for checks of his implanted defibrilator. (RSA/CRU 448.)

Unum conducted another medical review of Kagan's updated file, this time in December 2006. (RSA/CRU 434.) The document referring the file for review asked the reviewer whether there was "sufficient clinical proof of disability precluding sustained sedentary activity" following the June 2002 denial of benefits. (RSA/CRU 437.) Dr. Costas Lambrew ("Dr. Lambrew"), a Consultant Cardiologist for Unum, conducted the review. (RSA/CRU

1073.) [20] He reviewed the information Unum had received from the SSA, Dr. Dizon, Dr. Pechman, Columbia–Presbyterian Medical Center,[21] Horton, and the BOP. (RSA/CRU 1071.)

Dr. Lambrew noted that Kagan had not suffered any ischemia[22] or chest pain recently, nor arrhythmias since 2002; that Kagan's records contained "no clinical evidence of heart failure," as evidenced by the fact that Kagan's level of B-type natriuretic peptide (BNP) was far under that suggesting heart failure and that Dr. Pechman had discontinued use of a drug that treated heart failure in 2006; and that, though Dr. Pechman's 2004 pulmonary study had shown decreased lung capacity, that finding was inconsistent with Kagan's reported symptoms and the other medical evidence. (RSA/CRU 1072.)[23] Dr. Lambrew concluded that Kagan's limitations would not have precluded "sustained sedentary work" after June 2002. (*Id.*) "With a reasonable degree of medical certainty, I would conclude that the medical evidence, including the records from Dr. P[e]chman, support my conclusion that as of 6/17/02, Mr. Kagan had sustained full time seden-

---

**20.** Dr. Lambrew was, at the time of his review, Director Emeritus and Senior Consultant in Cardiology at Maine Medical Center and a Professor of Medicine at the University of Vermont Medical College. (RSA/CRU 1073.)

**21.** The records from Columbia–Presbyterian covered dates ending in July 2002. They did not cover an episode, discussed more fully *infra* note 33, in September 2006 during which Kagan was admitted to the hospital due to defibrillator "shocks." The administrative record is silent regarding whether Kagan shared records from the 2006 incident with Unum. (*See* RSA/CRU 32 (Kagan's "Reassessment Information Form," which asked him to list "any hospital/clinic where [he] received medical treatment, consultation, care or services" after his claim was closed in June 2002, omitting any mention of Columbia–Presbyterian).)

**22.** "Ischemia" is "deficient supply of blood to a body part (as the heart or brain) that is due to obstruction of the inflow of arterial blood (as by the narrowing of arteries by spasm or disease)." *Ischemia,* Merriam–Webster, *supra* note 10, http://www.merriam-webster.com/medlineplus/ischemia (last visited Mar. 29, 2011).

**23.** Dr. Lambrew also questioned the 2004 study's reliability, noting that the result did not conform to the standard result that would have indicated "severe non reversible obstruction." (RSA/CRU 1072.) Dr. Lambrew suggested that the results might have been altered by "obstruction of the mouthpiece by the tongue." (*Id.*) Dr. Lambrew noted that the 2004 study's results regarding Kagan's breathing capacity were "not consistent with the level of symptoms Mr. Kagan reports." (*Id.*)

tary work capacity, as a reflection of the nonmusculoskeletal problems, either individually or in the aggregate, with restrictions related to his defibrillator...." (RSA/CRU 1073.) Based on Dr. Lambrew's assessment, and the assessment of an orthopedic surgeon who reviewed Kagan's records relating to his joint and bone problems, Unum again denied Kagan benefits by letter dated February 23, 2007. (RSA/CRU 1090–94.)

### B. Procedural History

This case began in New York Supreme Court and was removed to this Court by Unum in October 2003. (Dkt. No. 1.) The Parties briefed and argued dispositive motions before Magistrate Judge Mark D. Fox (Dkt. No. 7 (Unum's motion for judgment on the administrative record); Minute Entry dated Feb. 15, 2005 (noting that Judge Fox held oral argument and reserved decision)), but the case was dismissed without prejudice in March 2005, when Kagan elected to have his claim reassessed by Unum, (Dkt. No. 16). Kagan reactivated the litigation in 2008, following Unum's reassessment of his claim. (Dkt. No. 17.) At a pre-motion conference held June 7, 2010, and via a June 14, 2010 scheduling order, the Parties agreed to file opposing "motion papers/trial briefs" by August 2010. (Dkt. No. 41.) The Court held oral argument on the motions on February 14, 2011.

### II. Discussion

#### A. Standard of Review

■ A participant or beneficiary of an ERISA-covered plan may sue "to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B). "Principles of trust law require courts to review a denial of plan benefits 'under a *de novo* standard' unless the plan provides to the contrary.... Where the plan provides to the contrary by granting 'the administrator or fiduciary *discretionary authority* to determine eligibility for benefits,' 'trust principles make a *deferential standard* of review appropriate.' " *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 111, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008) (alteration omitted) (emphasis in original) (quoting *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 111, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). Where such discretionary authority is not present, "a district court reviews all aspects of an administrator's eligibility determination, including fact issues, *de novo.*" *Locher v. Unum Life Ins. Co. of Am.,* 389 F.3d 288, 293 (2d Cir.2004). "[U]pon *de novo* review, a district court may render a determination on a claim without deferring to an administrator's evaluation of the evidence." *Id.* at 296. The question for the Court is simply "whether the decision to deny [Plaintiff's] claim was correct." *Curtin v. Unum Life Ins. Co. of Am.,* 298 F.Supp.2d 149, 153 (D.Me.2004).[24]

---

**24.** Much of Kagan's submissions are dedicated to chronicling alleged deficiencies in Unum's administrative decisionmaking process. Although such problems can, as discussed below, provide a district court with good cause to supplement the administrative record in ERISA cases, they do not change the ultimate question the court must answer to decide the case applying de novo review: whether the plan administrator's decision regarding the plaintiff's eligibility for benefits was correct. *See Locher,* 389 F.3d at 293 (noting that the district court's task is to review "an administrator's eligibility determina-

tion"). In other words, assuming Unum's internal procedures were inadequate, the remedy for that is the court's ability to consider additional evidence; it does not transform this case into merely an appeal of those procedures. Kagan's many challenges to Unum's decisionmaking process are therefore somewhat beside the point, in that the question before the Court is whether Kagan was in fact disabled as that term is used in the Plan, and not whether Unum utilized a perfect system for determining for itself whether Kagan was disabled. *See id.; see also Richards v. Hewlett–Packard Corp.,* 592 F.3d 232, 239 (1st

After some confusion, the Parties have ultimately agreed that the Plan here did not vest Unum with discretionary authority to determine eligibility. (*See* Def.'s Opening Trial Br. ("Unum Br.") (Dkt. No. 47.) 1; Def.'s Responsive Trial Br. ("Unum Reply") (Dkt. No. 50) 1; Pl.'s Reply Trial Br. ("Pl.'s Reply") (Dkt. No. 51) 2; *cf.* Mem. of Law in Supp. of Pl.'s Mot. ("Pl.'s Br.") (Dkt. No. 45) 15 (contending that an "abuse of discretion" standard applies).)[25] The Parties have neglected, however, to cite provisions of the Plan demonstrating that this is so. The Court's own review of the Plan (FULCL 768–92) reveals no Plan language granting Unum discretionary authority either to interpret the Plan's terms or to determine eligibility under the Plan. *Cf., e.g., Solomon v. Metro. Life Ins. Co.,* 628 F.Supp.2d 519, 527–28 (S.D.N.Y.2009) (discussing plan language granting such authority). Moreover, the Court may accept Unum's concession that a de novo standard should apply, because "[t]he plan administrator bears the burden of proving that the deferential standard of review applies." *Fay v. Oxford Health Plan,* 287 F.3d 96, 104 (2d Cir.2002); *see also Yasinoski v. Conn. Gen. Life Ins. Co.,* No. 07–CV–2573, 2009 WL 3254929, at *4 (E.D.N.Y. Sept. 30, 2009) (noting that de novo standard would apply when parties did not discuss plan language but agreed that de novo standard applied).

The Second Circuit has held repeatedly that "as a matter of general insurance law, the insured has the burden of proving that a benefit is covered." *Mario v. P & C Food Mkts., Inc.,* 313 F.3d 758, 765 (2d Cir.2010) (noting that the plan participant will generally bear the burden of proving facts that ERISA plan language makes "prerequisite[s] for entitlement to a benefit under an ERISA plan"). This principle governs here. Kagan thus bears the burden of proving by a preponderance of the evidence that he was "disabled" as defined by the Plan and therefore entitled to benefits under it. *See Paese v. Hartford Life & Accident Ins. Co.,* 449 F.3d 435, 441 (2d Cir.2006) ("At the outset of its analysis, [the district court] clearly and correctly stated that [the claimant] has the burden of proving by a preponderance of the evidence that he is totally disabled within the meaning of the plan." (internal quotation marks omitted)); *see also Richards v. Hewlett–Packard Corp.,* 592 F.3d 232, 239 (1st Cir.2010) ("Our guiding principle in conducting de novo review is that the plaintiff bears the burden of proving he is disabled." (alterations and internal quotation marks omitted)).

The Parties also disagree on how this Court should construe their motions. (Pl.'s Reply 2 n. 3 (requesting the Court consider the Parties' submissions as cross-motions for summary judgment); Unum Reply 2 (requesting a "bench trial on the papers").) This conflict is not new to ERISA cases in the Second Circuit. *See, e.g., Fairbaugh v. Life Ins. Co. of N. Am.,* 737 F.Supp.2d 68, 78, 79 n. 9 (D.Conn. 2010) (noting that "the Second Circuit treats appeals from rulings on motions for judgment on the administrative record as appeals from rulings on motions for summary judgment," but that the defendant

Cir.2010) ("[W]e stand in the shoes of the administrator to determine whether the administrative decision was correct." (alteration and internal quotation marks omitted)); *cf. Robbins v. Aetna Life Ins. Co.,* No. 03–CV–5792, 2006 WL 2589359, at *7 (E.D.N.Y. Sept. 8, 2006) (noting that even if plan administrator violated procedural requirement of ERISA, court would uphold its ultimate decision to deny benefits if it concluded that that decision was correct).

**25.** Both Parties apparently told Magistrate Judge Yanthis, who was supervising discovery, that this case was governed by an arbitrary-and-capricious standard. (Decision and Order ("Discovery Order") (Dkt. No. 30) 2.)

"propose[d] treating [the parties' motions] as a 'bench trial on the papers'"). The general practice is to treat the parties' submissions as cross-motions for summary judgment, and, if summary judgment is denied because material facts are in dispute, to conduct a "bench trial" with the Court acting as the finder of fact. *See id.* at 79 n. 9; *Black v. Pitney Bowes Inc.*, No. 05–CV–108, 2008 WL 3992306, at *4 (S.D.N.Y. Aug. 26, 2008); *Zurndorfer v. Unum Life Ins. Co. of Am.*, 543 F.Supp.2d 242, 254–55 (S.D.N.Y.2008) (citing *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir.2003)); *Lockhart v. Jefferson Pilot Fin. Ins. Co.*, No. 03–CV–1745, 2005 WL 914446, at *11–12 (N.D.Ill. Mar. 29, 2005) (ERISA case decided by "trial on the papers" following the court's denial of cross motions for summary judgment).[26] Plaintiff has brought a motion for summary judgment (Dkt. No. 43), and Unum has submitted briefs in opposition contending that judgment should be entered in its favor based on the undisputed facts in the administrative record.

Pursuant to Federal Rule of Civil Procedure 56, summary judgment "shall [be] grant[ed] ... if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("Rule 56[ ] mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). A fact is "material" when it may affect the outcome of the case under the governing substantive law, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is "genuine" if the evidence is such

---

**26.** This mechanism ensures that the district court applies a procedural vehicle contemplated by the Federal Rules of Civil Procedure. *See Muller*, 341 F.3d at 124 (noting that a "motion for judgment on the administrative record" is not contemplated by Federal Rules, but that district court's decision to conduct bench trial after having denied summary judgment motions was proper). The Second Circuit's cases on summary bench trials are illustrative. The Second Circuit has held that a district court may "decide a case by summary bench trial" based on the record developed in summary judgment motions "upon stipulation of the parties as long as the parties have willingly forgone their right to a full trial." *Acuff–Rose Music, Inc. v. Jostens, Inc.,* 155 F.3d 140, 142–43 (2d Cir.1998). In *Acuff–Rose*, the district court asked the parties, which had both argued the case could be decided on undisputed facts, whether they would consent to the court's acting as factfinder to decide disputed issues; the district court then decided the parties' motions not under Rule 56, but Rule 52. *Id.* at 142. The Second Circuit found no error because both parties had "waived [their] right[s] to a full trial and [had] allowed the court to decide the case based on findings of fact as well as law." *Id.* at 143. The court warned that district judges should not employ this mechanism of converting cross-motions for summary judgment under Rule 56 into submissions for a bench trial under Rule 52 without the parties' express stipulation in advance, especially when they have argued that the case can be resolved by summary judgment. *Id.*; *see also Midpoint Serv. Provider, Inc. v. CIGNA,* 256 F.3d 81, 86 (2d Cir.2001) (vacating and remanding district court's judgment entered after parties agreed case should be decided by joint statement of agreed facts, but parties submitted conflicting statements and district court decision resolved factual disputes); *Moore v. INA Life Ins. Co. of N.Y.,* 66 F.Supp.2d 378, 380 (E.D.N.Y.1999) (converting summary judgment motions in ERISA case to bench trial by stipulation of parties). Here, although the Parties did, earlier in this litigation, agree to a "bench trial on a stipulated record" (Stipulation (Dkt. No. 24) ¶ 2), the Court will not treat the parties as having consented to a summary bench trial in lieu of summary judgment given Plaintiff's current position that summary judgment is more appropriate.

that a reasonable jury could return a verdict for the nonmoving party. *Id.* The inquiry performed is the threshold inquiry of determining whether there are any genuine factual issues that properly can be resolved only by a finder of fact. *Id.* at 250, 106 S.Ct. 2505.

 When a district court conducts a de novo review of the decision of an ERISA plan administrator, the review "is limited to the record in front of the claims administrator unless the district court finds good cause to consider additional evidence." *DeFelice v. Am. Int'l Life Assurance Co.,* 112 F.3d 61, 67 (2d Cir.1997); *see also Locher,* 389 F.3d at 294 ("[T]he decision whether to admit additional evidence is one which is discretionary with the district court, but which discretion ought not to be exercised in the absence of good cause." (internal quotation marks omitted)). A "demonstrated" (as opposed to theoretical) "conflict of interest" on the part of the plan administrator or "procedural problems with the plan administrator's appeals process" can constitute good cause to expand the record. *Graham v. First Reliance Standard Life Ins. Co.,* No. 04–CV–9797, 2006 WL 3408548, at *1–2 (S.D.N.Y. Nov. 22, 2006) (internal quotation marks omitted).

Kagan seeks to have this Court consider a number of different pieces of evidence that are not included in the administrative record. (Decl. of Jonathan C. Corbett ("Corbett Decl.") (Dkt. No. 44) ¶ 4.) These include additional statements made by Dr. Dizon in connection with Kagan's application for benefits from a different insurer (*id.* Ex. A), a Regulatory Settlement Agreement entered into between Unum and the insurance regulators of several states and the United States Department of Labor (the "RSA") (*id.* Ex. D),[27] a copy of Kagan's medical records from Columbia–Presbyterian Medical Center from September 2006 (*id.* Ex. E), the deposition transcript of Unum's Rule 30(b)(6) witness (*id.* Ex. I), and Unum's responses to certain interrogatories, (*id.* Ex. J). Kagan contends that "good cause" exists for the Court to consider these documents because the medical reviewers Unum used to assess his claim for benefits were all Unum employees, demonstrating a "patent conflict of interest in Defendant's administrative reviewing body," and because Unum's decisionmaking process contained a number of other alleged procedural irregularities. (Pl.'s Br. 28.)[28] Unum responds by invoking a stipulation executed by the Parties on March 13, 2009 and approved by this Court, which provided

---

**27.** The RSA begins at the twenty-first unnumbered page of the Corbett Decl. Ex. D.

**28.** Plaintiff also notes that Magistrate Judge Yanthis, in a decision dated October 29, 2009 2009 WL 3486938, granted Plaintiff's motion for discovery outside the administrative record on the issue of whether Unum was influenced by a conflict of interest in its decision to terminate Plaintiff's benefits. (*See* Discovery Order 6.) Plaintiff contends that this decision is "law of the case" and binds this Court to consider evidence outside the administrative record. (Pl.'s Br. 25–27.) The discovery decision is not controlling as to whether this Court should consider the additional evidence obtained by the parties in discovery. Magistrate Judge Yanthis's order dealt only with

whether the material Plaintiff sought was "relevant" for purposes of Rule 26(b), not whether the evidence would ultimately be admissible. (*See* Discovery Order 2.) Furthermore, the order stated expressly (and correctly) that the standard a party must meet to obtain evidence outside the administrative record is lower than the standard a party must meet to introduce such evidence in the Court's final determination on the merits. (*Id.* at 3.) *See Trussel v. CIGNA Life Ins. Co. of N.Y.,* 552 F.Supp.2d 387, 390–91 (S.D.N.Y. 2008) ("The good cause standard required to obtain evidence beyond the administrative record is ... less stringent than when requesting that the court ... consider such evidence in its final determination.").

that "[t]he parties agree to a bench trial on a stipulated record, with the stipulated record being limited to" the administrative record submitted by Unum. (Stipulation (Dkt. No. 24) ¶ 2.) The Court will assume without deciding that the "deficiencies" Kagan alleges would constitute "good cause" to consider material extrinsic to the administrative record, and that Kagan can be relieved from his stipulation (*but see Booth v. Hartford Life & Accident Ins. Co. of Am.*, No. 08–CV–13, 2009 WL 652198, at *14 (D.Conn. Feb. 3, 2009) (declining to consider potentially relevant evidence because "the parties have stipulated that, on summary judgment, the court is not to consider information outside the Administrative Record")).

### B. Analysis

■ Upon a de novo review of the record, including the additional evidence Kagan seeks to introduce, the Court first concludes that Kagan was not "disabled," as defined by the Plan, when Unum terminated his benefit payments on June 17, 2002.

Although it is apparent that Kagan never made a full recovery following his 1998 surgery, the medical records taken together demonstrate improvement in his condition. For the period until Kagan left Otisville in June 2004, the BOP records provide the most detailed picture of Kagan's health, and, more to the point, his capacity to perform the "material duties of any gainful occupation for which [he] [was] reasonably fitted by training, education or experience." (FULCL 791.) Prior to the July 2002 incident during which the battery in Kagan's defibrillator ran low, Kagan had received a "Class I" classification at his Cardiac Clinics, indicating that ordinary physical activity did not result in symptoms, and described feeling generally fine, without shortness of breath or chest pain. (FULCL 395–96, 403–04; RSA/CRU 655.) And by the time

Kagan left Otisville two years later, his breathing was still normal and he was walking for exercise. (RSA/CRU 607.) Contrast this with Kagan's condition following his surgery in 1998 and 1999 (during which time Unum did provide him with benefits), when he could not sustain a phone conversation without labored breathing. (FULCL 795; RSA/CRU 290–91.)

Kagan obviously was not completely healthy during this period, and his medical records do contain notes of reported symptoms, such as vertigo and shortness of breath in January 2004 (RSA/CRU 611), and shortness of breath in January 2003, (RSA/CRU 633). But these symptoms did not prevent Kagan from working as a GED tutor on average seven hours per day, five days per week, from March 2003 through May 2004 without any time spent "medically unassigned" (RSA/CRU 477–98); nor did they prevent Kagan from working as an "orderly" from February 2000 through June 2002 with few medical leaves, (RSA/CRU 473–74). Indeed, Kagan appears to have asked to be able to work as early as 1999 (RSA/CRU 1008), and he was cleared for work duty in September 1999 with the only limitation being that his work should be "sedentary," (RSA/CRU 835). Each of these facts is undisputed.

■ "Generally, an employee who continues to report to work … cannot be found to have been simultaneously 'disabled' under the terms of an ERISA plan which defines disability [as] includ[ing] the inability to work." *O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 697 F.Supp.2d 474, 479 (W.D.N.Y.2010) (citing *Kunstenaar v. Conn. Gen. Life Ins. Co.*, 902 F.2d 181 (2d Cir.1990); *Zimmer v. Reliance Standard Life Ins. Co.*, No. 96–CV–5918, 1998 WL 661492 (S.D.N.Y. Sept. 25, 1998)). Kagan attempts to distinguish these cases on the basis that in each case,

the claimant continued to perform his or her original job full time without losing any time from work. (Pl.'s Reply 11.) *See Kunstenaar*, 902 F.2d at 182–83 (claimant lost no time from work and received no treatment or medication for alleged disability). The argument is a red herring; the relevant plan language in some of these cases defined disability, in whole or in part, as the inability to perform the duties of the claimant's particular occupation,[29] *see id.* at 182; *Zimmer*, 1998 WL 661492, at *2–3, so it is of no importance that the cases involve claimants who stayed at their original employment while Kagan (due to his incarceration) could not. The more general principle these cases establish is that if a Plan defines disability in such a way that is inconsistent with the performance of particular work, either the claimant's job or work in general, evidence that the claimant could do the specified work weighs against a finding of disability. *See Hershman v. Unumprovident Corp.*, 660 F.Supp.2d 527, 533 (S.D.N.Y.2009) (noting, where policy defined disability based on inability to perform claimant's occupation, that "there is far too much continuity between his work before and after the onset of his back condition to sustain a 'total disability' finding"); *Meyer v. Ins. Co. of Am.*, No. 97–CV–4678, 1998 WL 709854, at *8 (S.D.N.Y. Oct. 9, 1998) (holding, where plan defined disability based on inability to perform duties of employment for which claimant was quali-fied, that "[i]f there is sufficient evidence that [claimant] was able to or did perform any work, even if she was unable to perform her prior ... job ..., she was not disabled under the Policy").

It cannot be disputed that Kagan's prison jobs, GED tutor and orderly, were sedentary or near-sedentary occupations given the restrictions in his 1999 work clearance. (RSA/CRU 835.) According to the TSA conducted on behalf of Unum, the occupations for which Kagan was qualified were also essentially sedentary jobs. (FULCL 732.) Kagan was apparently able to perform his work well according to his evaluations (RSA/CRU 477–98), and he is not recorded to have complained at any point in his doctors' visits that performing his jobs interfered with his health, or vice-versa, and the medical records make clear that Kagan was not shy about vocalizing medical issues to his treating physicians. Given this evidence, the Court must conclude that Kagan was not disabled as of June 17, 2002, when Unum first denied his benefits claim and when he was working at Otisville.[30] *See, e.g., Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir.2005) (holding that substantial evidence supported finding that disability did not preclude gainful employment when claimant worked during the relevant period and no evidence existed that disability worsened following that time).[31]

---

**29.** Indeed, the plan language at issue in *Kunstenaar* mirrors the Plan here, in that it defined disability as the claimant's inability to perform the duties of his own job and, after he had received benefits for two years, of any job for which he was qualified. *Kunstenaar*, 902 F.2d at 182.

**30.** This also means that Kagan was not disabled under the Plan's terms through at least May 2004, when he stopped working in prison.

**31.** Kagan argues, for the first time in a post-argument letter, that his employment while in prison is not relevant to his status as disabled under the Plan because it was not *"gainful"* occupation; Kagan made apparently less than $1 per day while working in prison. (Letter from Joshua Mallin to the Ct. (Feb. 22, 2011) at 1–2.) The argument is singularly unpersuasive, as the Plan defines disability as the *inability*, resulting from "injury or sickness," to perform the material duties of "any gainful occupation" for which the claimant is qualified, not a simple failure to perform work that is in fact "gainful." (FULCL 791.)

Kagan claims to be entitled to all the benefits he would have been paid between Unum's initial denial, on June 17, 2002, and August 2006, when Kagan turned 65 years old. (Pl.'s Br. 1 n. 2.) Kagan notes that the Plan's "maximum benefit period" for employees in Kagan's position was payment up through age 65. (FULCL 779.) But the Court has determined that Kagan was not "disabled" as of June 17, 2002 (through May 2004). The Plan's plain terms preclude any award of benefits for any period of time following that date, even if Kagan's condition had materially worsened, a point the Court need not decide. The Plan's termination provision provides in relevant part:

You will cease to be insured on the earliest of the following dates:

1. the date the policy terminates;

2. the date your employer's coverage under the policy terminates;

. . . .

6. the date employment terminates. Cessation of active employment will be deemed termination of employment, except:

 a. if you are disabled your insurance will be continued during:

 . . .

 ii. while benefits are being paid.

 b. your employer may continue your insurance by paying the required premium. . . .

(FULCL 772.) Kagan's ceased his "active employment" with KBC no later than July 1999, when he began serving his sentence. (RSA/CRU 476; *see also* FULCL 783 (defining "[a]ctive employment" as work "for your employer on a full-time basis"); FULCL 782 (defining "[e]mployer" as an entity approved for participation in the Plan by Unum).) Thus, his insurance under the Plan would continue only "while benefits [were] being paid," and those benefits ceased June 17, 2002. (FULCL 776 (providing that benefits would cease "on

the earliest of . . . [among other dates] the date you are no longer disabled").) Because Kagan's coverage terminated, at the latest, on June 17, 2002, he was not entitled to any further benefits under the Plan for any period of time thereafter. *See Meyer*, 1998 WL 709854, at *2 n. 4 (construing policy with similar language and holding that a finding of non-disability at a particular date caused coverage under the policy to lapse, even if the claimant became totally disabled thereafter).

Kagan invokes the Plan's "Recurrent Disability" provision, which provides that a claimant's period of disability will continue without break even if the claimant returns to work for a short period after first becoming disabled. (Letter from Joshua Mallin to the Ct. (Feb. 22, 2011) at 2–3.) Specifically:

We will treat a recurrent disability as part of the prior disability if, after receiving disability benefits, you:

1. return to your regular occupation on a full-time basis for less than six months; and

2. perform all the material duties of your occupation.

Benefit payments will be subject to the terms of this plan for the prior disability. If you return to your regular occupation on a full-time basis for six months or more, a recurrent disability will be treated as a new period of disability.

(FULCL 776.) The effect of this provision is to allow a claimant who becomes disabled, recovers and returns to work, and soon becomes disabled again, to have the two periods of disability treated as one for benefits purposes, avoiding the procedures required to begin a period of disability coverage under the Plan. (Letter from Patrick W. Begos to the Ct. (Feb. 21, 2011) at 2.)

It is not clear from the face of the Plan whether the Recurrent Disability provision can do what Kagan suggests: extend cov-

erage under the Plan beyond the date on which the Plan itself terminated. But even leaving that aside, the provision is plainly inapplicable to the facts of this case. First, Kagan did not "return to [his] regular occupation," at KBC, but rather worked in prison between July 2002 and May 2004. Kagan's work in prison plainly cannot constitute his "regular occupation," as Kagan suggests (*see* Letter from Joshua Mallin to the Ct. (Feb. 22, 2011) at 3), because one requirement of recurrent disability is that the claimant "*return[s]*" to his "regular occupation," excluding situations in which a claimant moves to an entirely new one, (FULCL 776 (emphasis added).) Second, Kagan did not return to work for "less than six months." Therefore, Kagan is not entitled to any benefits he would have been paid under the Plan between June 2002 and August 2006.

Kagan raises essentially three arguments in support of his claim of being "disabled" under the Plan. First, he contends that Unum failed to give sufficient weight to Kagan's award of SSDI benefits. (Pl.'s Br. 17.) Second, he argues that Unum erred by disregarding Dr. Pechman's position on Kagan's disability without conducting an independent medical evaluation ("IME") to resolve Dr. Lambrew's disagreement with Dr. Pechman's conclusions. (*Id.* at 18–22.) Third, he argues that Unum's EFAF and TSA were flawed because Dr. Dizon consistently stated that he could not assess Kagan's functional ability fully and because the TSA did not determine whether the jobs it identified that Kagan could perform were actually available in the local economy. (*Id.* at 22–25.)

▐ The first argument ignores the undisputed fact that the SSA did not reevalu-

ate Kagan when he left prison in 2004, and instead simply started paying him the same benefits it had been paying him since 1999. (RSA/CRU 263, 265.) Therefore, the SSA's determination that Kagan was entitled to SSDI benefits rested entirely on Kagan's condition in 1999, which is not at issue in this action. *See Hobson v. Metro. Life Ins. Co.,* 574 F.3d 75, 92 (2d Cir.2009) (holding that SSA's evaluation of plaintiffs pre-surgery condition was "no longer relevant" because ERISA plan's determination to deny benefits was based on post-surgical recovery). Moreover, as the Second Circuit has noted, the statutory definition of "disability" is not binding on the interpretation of an ERISA plan's definition of the term. *Kunstenaar,* 902 F.2d at 184; *see also Billinger v. Bell Atl.,* 240 F.Supp.2d 274, 285 (S.D.N.Y.2003) (noting that while social security awards may be "evidence" of complete disability, they are "far from determinative," and the relevant plan language governs (internal quotation marks omitted)).

Kagan's second argument—that Unum unjustifiably discounted Dr. Pechman's conclusion without conducting an IME of Kagan—proceeds from the false premise that Unum did not seek to clarify the basis of Dr. Pechman's opinion, instead discounting it without reason. (Pl.'s Br. 19; Pl.'s Reply 9.) In fact, the record shows that Unum did reach out to Dr. Pechman's office before it denied benefits in June 2002, and confirmed that Kagan had not seen Dr. Pechman in "over a year." (FULCL 707.) At bottom Kagan's complaint is that Unum did not accord Dr. Pechman's opinion the weight Kagan thinks it should have done. (Pl.'s Reply 8–9.) But that is insufficient in and of itself to establish that Unum's ultimate decision was incorrect.[32]

---

32. The Supreme Court has held that ERISA plan administrators owe no special deference to a treating physician's opinion and that plan administrators do not bear a "discrete burden

of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability*

To the extent Kagan faults Unum's failure to conduct an IME in and of itself, the Plan gave Unum the *option* to conduct a medical evaluation of a claimant, but imposed no obligation that it do so. (FULCL 770.) Nor has Kagan pointed to any case holding that a plan administrator is *obligated* to conduct an IME in every instance, particularly where, as here, other clear and undisputed evidence showed that Kagan could perform work in a manner inconsistent with the Plan's definition of disability. *Cf., e.g., Strope v. Unum Provident Corp.*, No. 06–CV–628C, 2010 WL 1257917, at *7 (W.D.N.Y. Mar. 25, 2010) (remanding to plan administrator where administrator had failed to conduct an IME and denied benefits *"not* [based] *on evidence that plaintiff was able to work,*

but on what it perceived as a lack of clinical support for her claim of disability" (emphasis added)); *cf. also Hobson,* 574 F.3d at 91 (holding that "where the ERISA plan administrator retains the discretion to interpret the terms of its plan, the administrator may elect not to conduct an IME, particularly where the claimant's medical evidence on its face fails to establish that she is disabled"). Although a plan administrator's failure to obtain an IME can, in some circumstances, be considered a procedural irregularity allowing consideration of extrinsic evidence, *see Jackson v. Metro. Life Ins. Co.*, 303 F.3d 884, 889 (8th Cir.2002), the materials proffered by Kagan do not establish his disability, and that Unum failed to conduct an IME is not a substitute for such evidence.[33]

Plan v. Nord, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Therefore, even indulging Kagan's view that Dr. Pechman was his "treating physician" at the relevant time, (*see* Pl.'s Reply 8), Unum did not commit any legal error in rejecting his view. And even though Unum had no special burden of explanation regarding Dr. Pechman's opinion specifically, Dr. Lambrew *did* explain in detail why Dr. Pechman's results were unreliable and conflicted with all the other available evidence. (RSA/CRU 1072.) But even if, contrary to *Black & Decker*, a "treating physician's" opinion *were* entitled to extra weight, it is undisputed that Kagan's doctors in prison, and not Dr. Pechman, were the doctors seeing him when Unum denied benefits in June 2002. It is Kagan, not Unum, who is ignoring the views of these "treating physicians."

**33.** The same can be said for two of the documents outside the administrative record on which Kagan particularly relies. First, Kagan points to medical notes indicating that he was admitted to Columbia–Presbyterian Medical Center on September 27, 2006, due to "multiple [defibrillator] shocks." (Corbett Decl. Ex. E, at I.) Kagan had apparently been "walking up and down the stairs in his house" when he suffered the first of these shocks. (*Id.*) The physical exam conducted at Columbia–Presbyterian showed that Kagan's "[c]hest [was] clear," that he had no "wheezes or crackles," that Kagan's heart operated at a "regular rate

and rhythm without murmurs," and that his defibrillator showed no evidence of infection. (*Id.* at 2.) Kagan's defibrillator was exchanged for a high energy device, which it was thought would offer Kagan greater security. (*Id.*) Kagan's chest x-ray was "within normal limits." (*Id.*) Kagan was discharged on September 30, 2006. (*Id.* at 1.)

This incident is irrelevant. For one thing, it took place after the time period for which even Kagan claims to be entitled benefits, let alone after he was actually covered under the Plan. Moreover, the description of the incident does not give any indication that Kagan would not be able to perform the material duties of employment for which he was qualified because of what happened to him, as the occupations identified in Unum's TSA were sedentary.

Second, Kagan relies heavily on the Regulatory Settlement Agreement and Unum's alleged failure to comply with it as evidence that Unum's evaluation of Kagan's claim was inadequate. With regard to IMEs specifically, the Agreement does indeed contain "Guidelines for Independent Medical Evaluations." (RSA (Corbett Decl. Ex. D at unnumbered 21) Ex. 6.) Notably, Dr. Lambrew's medical review appears to have complied with these guidelines, as he identified the disagreement with Dr. Pechman and certified that there was a reasonable medical certainty that Dr. Pechman was incorrect and inconsistent with the other substantial evidence in

Finally, Kagan's challenges to the EFAF and transferable skills analysis fail. It is true that Dr. Dizon did note that he was unable to "fully" assess Kagan's functional ability. (FULCL 570.) But he was still able to fill out the EFAF based on Kagan's own report to him about his condition and abilities. (FULCL 571.) Unum can hardly be faulted for relying on Kagan's own statements at the time it made its benefits decision. Moreover, Dr. Dizon's report is consistent with the relevant medical evidence. The EFAF was received by Unum by June 2002, and in April of that year Kagan's medical notes indicate no shortness of breath, chest pain, or palpitations at a checkup. (FULCL 394.) During this period Kagan was also given a Class I classification. (FULCL 403–04.) Kagan has pointed to no evidence that would undermine the EFAF's assessment of Kagan's functional ability, and the fact that Kagan was working when the report was completed suggests there is none. And, though he alleges the EFAF is flawed because he was never interviewed or contacted by Unum (Pl.'s Br. 24), Kagan points to nothing whatsoever in the record that contradicts the EFAF's findings.

Kagan also faults Unum's vocational analysis for not determining whether the recommended occupations in fact existed in the economy. (Pl.'s Br. 24; Pl.'s Reply 12.) But this is belied by the record, as the TSA indicated that the seven occupations it identified "exist[ed] within the claimant's local labor market," citing a number of studies from the late 1990s and 2000s. (FULCL 733.) And, moreover, the TSA complied with the Second Cir-

cuit's leading case discussing vocational analyses, *Demirovic v. Building Service 32 B–J Pension Fund,* 467 F.3d 208 (2d Cir. 2006). In *Demirovic* (on which, mysteriously, Kagan's counsel relied heavily at oral argument), the Second Circuit held that a plan defining disability as the inability to perform any gainful occupation required the administrator to conduct a "non-medical assessment as to whether [the claimant] has the vocational capacity to perform any type of work—of a type that actually exists in the national economy—that permits her to earn a reasonably substantial income from her employment, rising to the dignity of an income or livelihood." 467 F.3d at 215. The court did not require that this assessment be done in a particular way, and was very clear that plan administrators have "broad discretion" in choosing the "particular method to determine a claimant's vocational capacities." [34] *Id.* In particular, one method expressly blessed by the Second Circuit was a "transferrable skills analys[is] using a claimant's education and former work experience to find occupations that involved skills that he could transfer from his previous jobs," *id.* (alterations and internal quotation marks omitted)—precisely the analysis Unum used in this case. *Demirovic* makes clear that Unum did not have use that method, and that the analysis it did use in this case was proper.

In the final analysis, this case involves more than just a battle of doctors' opinions about Kagan's health. To be sure, that battle has been waged. But, most tellingly, there is *undisputed* evidence that re-

Kagan's file. (RSA/CRU 1072; RSA Ex. 6 ¶ A(2) (describing circumstances under which independent medical examination would not be necessary).) More generally, the Regulatory Settlement Agreement is express that it does not change Unum's obligations under the Plan or supersede Plan language. (RSA § C(11).)

34. The Second Circuit found the plan administrator's decision to deny benefits in *Demirovic* arbitrary and capricious because the record showed "a *complete absence* of consideration of [the plaintiff's] vocational circumstances." *Demirovic,* 467 F.3d at 216 (emphasis added).

gardless of his health issues, Kagan regularly worked during the time he claims he was disabled. Therefore, the Court finds that judgment for Unum is appropriate.

### III. Conclusion

For the reasons stated herein, the Clerk of Court is respectfully directed to terminate the pending motion, (Dkt. No. 43), enter judgment for Defendant, and close this case.

SO ORDERED.